**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**SHARON McLEOD,**                                                    :
                                                                      :
                                         **Plaintiff,**               : **Case No. 14 CV. 10041**
                                                                      : **(ALC) (JCF)**
          **- against -**                                             :
                                                                      :
**POSTGRADUATE CENTER FOR MENTAL**                                    :
**HEALTH, HELAINE FOX, MARCIA HOLMAN,**                               :
**DIANA MUSCA and MARY McGOVERN,**                                    :
                                                                      :
                                         **Defendants.**              :
-------------------------------------------------------------------------x

<u>**AFFIRMATION OF MICHAEL L. ABITABILO, ESQ. IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION TO ENFORCE SETTLEMENT**</u>

   MICHAEL L. ABITABILO, an attorney duly admitted to practice before this Court and the courts of the State of New York, hereby affirms under penalty of perjury that the following statements are true:

   1. I am a Principal with the law firm of Jackson Lewis P.C., counsel for Defendants Postgraduate Center for Mental Health ("PCMH"), Helaine Fox, Marcia Holman, Diana Musca, and Mary McGovern (hereinafter collectively referred to as "Defendants"), in the above-entitled matter. As such, I am fully familiar with the facts and circumstances contained herein. This Affirmation is submitted in support of Defendants' motion to enforce the parties' settlement agreement.

   2. On or about December 11, 2014, Plaintiff filed a Complaint in the above-captioned matter in the United States District Court for the Southern District of New York (hereinafter referred to as "the Complaint"). A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

3.      On or about February 27, 2015, following an Order to Amend, Plaintiff filed an Amended Complaint (hereinafter referred to as the "Amended Complaint). A true and correct copy of the Amended Complaint is attached hereto as **Exhibit B**.

4.      On or about November 25, 2015, Defendants filed Answers to the Amended Complaint. True and correct copies of Defendants' Answers are collectively attached hereto as **Exhibit C**.

5.      On May 20, 2016, the parties participated in a mediation pursuant to the Court's Alternative Dispute Resolution Program. The assigned mediator was Russell Morris, Esq., and the mediation was held at the courthouse located at 40 Foley Square, New York, NY 10007.

6.      Plaintiff appeared in person and was represented at the mediation by Vartges Saroyan, *pro bono* counsel assigned for the limited purpose of the mediation.

7.      Defendants Marcia Holman and Mary McGovern participated on behalf of PCMH and in their capacities as individually named defendants, and were represented by Michael L. Abitabilo of Jackson Lewis P.C.

8.      Near the conclusion of the mediation, the parties reached an agreement to resolve the case. In addition to the monetary terms of the settlement, the parties agreed to additional terms including (1) a full release of all claims against Defendants; (2) confidentiality; (3) non-disparagement; (4) a no re-hire provision; (5) non-admission language; (6) medicare affirmation language; (7) the provision of a neutral letter of reference; and (8) the execution of a Stipulation of Discontinuance With Prejudice.

9.      Prior to the conclusion of the mediation, the parties and/through their respective counsel drafted, reviewed, considered, and executed a term sheet memorializing the agreed upon terms. A true and accurate copy of the term sheet is  attached hereto as **Exhibit D**.[1]

10.      On May 23, 2016, *pro bono* counsel for Plaintiff emailed the undersigned regarding the settlement agreement.  The undersigned responded to that email later that evening.  A true and accurate copy of this email correspondence is attached hereto as **Exhibit E**.

11.      On May 26, 2016, *pro bono* counsel for Plaintiff sent an additional email to the undersigned regarding this matter.  A true and accurate copy of this email and related correspondence is attached hereto as **Exhibit F**.

12.      True and correct copies of all unpublished decisions cited in Defendants' Memorandum of Law in Support of the underlying motion are collectively attached hereto as **Exhibit G**.

WHEREFORE, for the reasons set forth in Defendants' accompanying Memorandum of Law, Defendant respectfully requests that this Court grant its motion to enforce settlement in its entirety.

Michael L. Abitabilo

Dated:       June 14, 2016
             White Plains, New York

---

[1]      Due to the confidential nature of the settlement agreement, Defendants intend to seek permission to file the term sheet under seal. An unredacted copy of the term sheet will be presented to the Court for inspection in connection with Defendants' attempt to enforce the settlement agreement.

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHARON Mcleod

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Post Graduate Center For Mental
Health
• HELAINE FOY     • DIANA MUSCA
• MARCIA HOLMAN   • MARY McGovern

*(In the space above enter the full name(s) of the defendant(s).*
*If you cannot fit the names of all of the defendants in the space*
*provided, please write "see attached" in the space above and*
*attach an additional sheet of paper with the full list of names.*
*Typically, the company or organization named in your charge*
*to the Equal Employment Opportunity Commission should be*
*named as a defendant. Addresses should not be included here.)*

RECEIVED
DEC 11 2014
PRO SE OFFICE

**COMPLAINT**
**FOR EMPLOYMENT**
**DISCRIMINATION**

Jury Trial: ☑ Yes  ☐ No
*(check one)*

**14 CV 10041**

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

✓     Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
*NOTE: In order to bring suit in federal district court under Title VII, you must first obtain a*
*Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
*NOTE: In order to bring suit in federal district court under the Age Discrimination in*
*Employment Act, you must first file a charge with the Equal Employment Opportunity*
*Commission.*

_____    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
*NOTE: In order to bring suit in federal district court under the Americans with Disabilities Act,*
*you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity*
*Commission.*

_____    New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

_____    New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

② POST Graduate Center for Mental Health
    DIANA MUSCA
    71 West 23rd Street 7th Fl.
    NEW YORK, NY. 10010
    212-576-4100
    EMAIL: dmusca@pgcmh.org

③ Post graduate Center for Mental Health
    MARCIA HOLMAN
    71 West 23rd STREET 7th Fl.
    New York, N.Y. 10010

④ Post graduate Center for Mental Health.
    MARY McGOVERN
    71 West 23rd Street 7th Fl.
    New York, N.Y. 10010
    212-576-4100

**I.   Parties in this complaint:**

A.   List your name, address and telephone number.  Do the same for any additional plaintiffs named.
     Attach additional sheets of paper as necessary.

Plaintiff        Name    SHARON McLEOD
                 Street Address   150 OCEAN AVENUE 1E
                 County, City   BROOKLYN N.Y.
                 State & Zip Code   NEW YORK  11225
                 Telephone Number   347-607-0850

B.   List all defendants' names and the address where each defendant may be served.  Make sure that the
     defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets
     of paper as necessary.

Defendant        Name    Helaine Fox (Post Graduate Center for Mental Health
                 Street Address   11 West 23rd Street 7th Floor
                 County, City   NEW YORK
                 State & Zip Code   NY  10010
                 Telephone Number   212-576-4100
                 See attached for additional defendants.

C.   The address at which I sought employment or was employed by the defendant(s) is:

                 Employer   Post Graduate Center for Mental Health
                 Street Address   11 West 23rd Street
                 County, City   NEW YORK
                 State & Zip Code   NY  10010
                 Telephone Number   212-576-4100

**II.   Statement of Claim:**

State as briefly as possible the facts of your case, including relevant dates and events.  Describe how you were
discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts
to support those claims.  You may wish to include further details such as the names of other persons involved
in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as
necessary.

A.  The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____          Failure to hire me.

___✓___         Termination of my employment.

_____          Failure to promote me.

_____          Failure to accommodate my disability.

_____          Unequal terms and conditions of my employment.

✓ _____ Retaliation.

_____ Other acts *(specify)*: _____ .

*Note:   Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.   It is my best recollection that the alleged discriminatory acts occurred on: 7/18/14 .
                                                                                    *Date(s)*

C.   I believe that defendant(s) *(check one)*:

        _____ is still committing these acts against me.

        ✓ is not still committing these acts against me.

?) D.   Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

        ☑ race   Black _____           ☐ color _____

        ☐ gender/sex _____             ☐ religion_____

        ☐ national origin _____

        ☐ age.   My date of birth is _____   *(Give your date of birth only*
                 *if you are asserting a claim of age discrimination.)*

        ☐ disability or perceived disability, _____ *(specify)*

E.   The facts of my case are as follow *(attach additional sheets as necessary)*:

I was asked by Assistant Vice President Mary McGovern
to Terminate an employee who was thought to be
Mentally Ill. I Explained to her I was not Comfortable
in doing so, because of fear for my life and the employees
I supervised. A series of Retaliation Started and I
was Subsequently told ~~office~~ I was fired because I
was not a "good fit".

*Note:   As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.   Exhaustion of Federal Administrative Remedies:

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: 8/14/2014 _____ *(Date)*.

*Rev. 05/2010*                                3

B.      The Equal Employment Opportunity Commission *(check one)*:

_____      has not issued a Notice of Right to Sue letter.

___✓___      issued a Notice of Right to Sue letter, which I received on 12 2 14 _ *(Date)*.

*Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.      Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____      60 days or more have elapsed.

_____      less than 60 days have elapsed.

## IV.     Relief:

**WHEREFORE**, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: To Be determined

_____

_____

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*


**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 11 day of December , 2014.

                Signature of Plaintiff _Sharon Mhead_

                Address _150 Ocean Avenue 1E_

                _Brooklyn, N.Y. 11225_

                _____

                Telephone Number _347-607-0850_

                Fax Number *(if you have one)* _____

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Sharon B. McLeod<br>150 Ocean Avenue, Apt. 1-E<br>Brooklyn, NY 11225 | From: New York District Office<br>33 Whitehall Street, 5th Floor<br>New York, NY 10004 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No.<br>520-2014-03293 | EEOC Representative<br>Thomas Perez, Investigator | Telephone No.<br>(212) 336-3778 |
|---|---|---|

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

11-28-2014
(Date Mailed)

Enclosures(s)

cc: Helaine Fox
Director of Human Resources
POST GRADUATE CENTER FOR MENTAL HEALTH
71 West 23rd Street
Manhattan, NY 10010

# Exhibit B

*14 CV. 10041 (LAP)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OR NEW YORK

Sharon Maland

150 Ocean Ave J6

Brooklyn NY 11225

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Post Graduate Center for Mental Health;
Helane Lor, Marcia Holman; Diana Musca
MaryMcGovern

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant.  Addresses should not be included here.)*

**AMENDED
COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

Jury Trial: ☑ Yes ☐ No
*(check one)*

Civ. _____ ( ___ )

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/15

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
*NOTE: In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
*NOTE: In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

_____ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
*NOTE: In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

_____ New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

_____ New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

**I.     Parties in this complaint:**

A.     List your name, address and telephone number.  Do the same for any additional plaintiffs named.
Attach additional sheets of paper as necessary.

Plaintiff     Name  Shamu McLeod
Street Address  150 Ocean Ave 1E
County, City  Brooklyn, N. 11225
State & Zip Code  Brooklyn NY 11225
Telephone Number  317-607-0850

B.     List all defendants' names and the address where each defendant may be served.  Make sure that the
defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets
of paper as necessary.

Defendant     Name  Post-Gradyate Center for Mental Health
Street Address  71 West 23rd Street 7th Floor
County, City  New York
State & Zip Code  New York, NY 10010
Telephone Number  212-576-4100 EXT 166

C.     The address at which I sought employment or was employed by the defendant(s) is:

Employer  Post Gradyate Center for Mental Health
Street Address  71 West 23rd Street, 7th Floor
County, City  New York NY.
State & Zip Code  New York, NY 10010
Telephone Number  212-576-4100  ext. 166

**II.     Statement of Claim:**

State as briefly as possible the facts of your case, including relevant dates and events.  Describe how you were
discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts
to support those claims.  You may wish to include further details such as the names of other persons involved
in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as
necessary.

A. The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____     Failure to hire me.

_____     Termination of my employment.

_____     Failure to promote me.

_____     Failure to accommodate my disability.

___✓___     Unequal terms and conditions of my employment.

             Retaliation.

*Rev. 07/2007*

2

✓      Other acts *(specify)*: Bullying & Harrashment

> *Note:* Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.

B.    It is my best recollection that the alleged discriminatory acts occurred on: 6/6/2014 - 7/22/14
                                                                                  *Date(s)*

C.    I believe that defendant(s) *(check one)*:

        _____    is still committing these acts against me.

        _____    is not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

     ☐    race _____            ☐    color _____

     ☐    gender/sex _____      ☐    religion _____

     ☐    national origin _____

     ☐    age.    My date of birth is _____    *(Give your date of birth only if you are asserting a claim of age discrimination.)*

     ☐    disability or perceived disability, _____ *(specify)*

E.    The facts of my case are as follow *(attach additional sheets as necessary)*:

I was persistently harassed after I refused to fire an employee who the company thought was Mentally ill. Mary McGovern asked me to fire him based on his work. However after reviewing his work and that off all my staff, he was no worse off. I also called his client see attached I told her I could not fire her based on those reasons. Then the retaliation started. After Ramon threaten the building severely it became worse. I was blamed for him still being there. Then I was then fired

> *Note:* As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.

## III.   Exhaustion of Federal Administrative Remedies:

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: \_\_\_\_8/2014_____ *(Date)*.

B.    The Equal Employment Opportunity Commission *(check one)*:

✓     has not issued a Notice of Right to Sue letter.

✓     issued a Notice of Right to Sue letter, which I received on 10/2014 ____ *(Date).*

*Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.     Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one):*

_____     60 days or more have elapsed.

_____     less than 60 days have elapsed.

## IV.    Relief:

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _____

Monetary damage, Maximum allowed by law _____

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 21 day of February, 2014

Signature of Plaintiff    Sharon Ntees

Address    150 Ocean Avenue 1E
           Brooklyn, NY, 11225

Telephone Number    347-607-0850

Fax Number *(if you have one)* _____

Incidence #1: On April 22, 2014, the second day on the job, at the suggestion of the former Assistant VP Mary McGovern after I initially met with Mary and she voiced her opinion on what the current issues were. She suggested I meet with each staff member individually to get there version of what they believe are some of the issues. On April 22nd I met with each Care Coordinator. At the initial interaction with one the CC (KL) , I was deeply concerned at his initial presentation and was very uncomfortable, if not down- right scared for my life. Since I kept the door closed when I spoke with the other Care Coordinators, I gave him the same courtesy. I asked what I could do to make him more successful on the job and he replied "stop writing me up and threatening to fire me". I assured him I would do my best to support his growth and success at the company.

Immediately after the meeting with KL, I approached the Assistant VP Mary McGovern and voiced my concern. I explained to her that based on some of the things he said to me, ( such as: people are following him wherever he goes and threatening to hurt him, they follow-up into the elevator and into the bathrooms, talking to him and trying to get his attention. Also he stated he can't focus in the office because it was too much talking and people are always coming to his desk and disturbing him. This is the reason why he can't get the paper work done in a timely manner. He also stated he previously moved from a desk in the front and came to the back, but the disturbance continued and that is why he wears the ear plugs in the office). I told Mary that my assumption at the time, based our conversation is that is a possibility he may be a Paranoid Schizophrenic with Delusion. I was deeply concerned for my safety, as well as the staff. Mary She said, "this has been going on for several years". It apparently started after he was beaten up by several men in his neighborhood. She said she had spoken with VP Marcia Holman who said there is nothing we can do and he was already given a list of places to go for help.

After reviewing his paperwork I spoke with Mary and it was agreed upon that we would change the days he is in the office to Mondays and Wednesdays when the office is less crowded as he may be able to focus better. At the end of April we had our monthly staff meeting, during the meeting KL was making certain echoes as if he was speaking to someone. Following this meeting I had a staff meeting with the Brooklyn staff, who brought up the issue of KL echoes in the previous meeting. I informed them I will speak to Mary. They inform me they had already as a group spoken with both Mary and KL previous supervisor and "it's getting worse". I inform them again I will address the issue with Mary. I once again spoke with Mary and she said she already Spoken to Marcia and there is nothing we can do. I spoke with Elena his previous interim supervisor and we agreed to speak to Mary together. Once again Mary told us there is nothing that can be done and Marcia is aware of the issue. Sometime later, KL had a client at the Atlantic Avenue shelter, he informed me during supervision that he was unable to get in to see the client. I spoke with shelter director Ms. Johnson who said she would investigate the matter. I once again spoke with Mary informing her that I believe people on the outside may have the same perception I did and it is a cause for concern when assigning new cases. She said the best way to get rid of him was to write him up because he already has two write-ups and one more he would be fired . I told her, I was very uncomfortable doing so, because I was scared and there is safety concern for the staff. Also I did not know the severity of the issue. She told me just do the write up and she would fire him. She proceeded to give me a copy of his previous write-ups. I asked Mary if I should call his clients, she said it would not make any difference, because it would be his word against the clients. I reviewed KL work and informed

Mary that though he was behind it was no worse off that the other staff. Also from my discussion with other supervisors, he was not that worse off than any CC in the entire program. I continued to monitor his work and spend a tremendous amount of time on Monday going over his work and giving him instructions. I also encouraged him to keep in touch with me throughout the day and I would often call and text him to follow-up on his daily activities.

At the beginning of June during a staff with VP Marcia Holman, Assistant VP Mary McGovern, new director Diana Musa, KL again started making loud noises as if he was speaking to someone or blocking out voices. After the staff meeting the Brooklyn Staff came to my office and asks me to please do something it's getting worse. I told them to address the issue with Mary. They all went to her office and spoke with her, after which they came back to my office and told me Mary said "there is nothing she can do". Shortly thereafter we went to the supervisor's meeting. Diana asked "what was the issue with that guy". Mary said to Marcia, I was going to speak with you about it. Mary told Marcia "as I told you in the past this is been going on for several years. He has Delusions of gay men trying to seduce him and people following him into the elevator and bathroom". As per Mary this started several years ago after he was attacked. Marcia wanted to know if I had called his clients. ( see attached email). Later that day I received a call from Diana, she asked me if I asked his client about the change in his behavior within the last two weeks. I responded to her that the behavior that not starts occurring in the last two weeks it has been going for years. At this particular point I realized they wanted to use me as a pawn. If I agreed that his behavior started in the last two weeks we could fire him on the basis that his work is not up to date and not because we believe he is ill. After this incident I could see the change in Marcia and that's when the Harassment and Retaliation started by Diana.

Approximately two weeks ago, Diana informed me that KL had made some threatening remarks to the security in the building and calls them names. Diana, I and KL had a meeting. Diana told Kl of some of the complaints against him and if they were true, to which he once again told the same story gay men are following him everywhere he goes, into the bathroom and elevators and are hitting on him. He also said every time he goes by the securities in the building are talking about him. They are also pedophiles. Diana asked KL so if the security says hi to her when she goes by does that mean they are hitting on her? to which KL replied no, they are just after him. Diana asked KL why does he believes this, he said the only answer he has are the people he talks to outside of the job, maybe" cohosting" with the security to and certain things they may have reported back to the security and that is why they are mad at him. KL told Diana that to prove his case as crazy as it sounds he would record the conversation as a proof. Diana asked Kl if what he is saying sounds reasonable to him, he said it does not, he knows it sounds crazy, because he is studying for a PhD. in Psychology, nevertheless it is his truth. Diana asked if I had anything to say, I asked KL why he did not bring this issue up in supervision to that I can address it. KL replied "this has been going on for years; they have been following and harassing me for years. I told Mary, Tom and Elena and nothing has changed so why continue to talk about it. Kl then left the room to which Diana "respond this guy is clearly psychotic, we have to do something". I e-mailed Diana on 7/17/14 to request a meeting to follow-up on the issue, she did not respond.

On Diana's first day she met with me briefly. Her initial question was why I wrote letter regarding KL. I informed her that when she asked if I had asked KL client about changes within the last two weeks, iI

believed that was an attempt the put the situation in my shoulder and that was unreasonable because this Issue has been going on for years. She said it is now in the past and this was a fresh start. "She said I would never throw you under the bus like Mary".


Second incidence:

On Monday July 7th at about 3:30PM I received a call from Marcia, informing me CC AJ had been terminated and I should leave my door open in case I heard any commotions. AJ was apparently supposed to drop off the phone and other items to Marta. I was in supervision with KL, for about 2 hours during that time if did not hear any commotion. Therefore, I assume AJ came and left. I also assume Diana was in her office and would handle any issues which may arise. I finished my supervision about 5PM with KL and went to Diana office, I noticed she was not there, I went to Marta to inquire and she informed me Diana left several hours ago. The next morning Diana asked why . I asked her why she did not inform me she was leaving the office, if she and Marcia believed they were terminating a potentially violent employee, also why she allowed her to come back to the office after leaving the Townhouse. She said she was at the Townhouse with Marcia and had left since 3PM. I asked her why she did not inform me she was leaving since the other supervisor was out and we were the only two in the office, did not answer, but walked out of the office.

Incident #3: I was asked by Diana along with another supervisor to separate all AOT and Non-Medicaid charts. The other supervisor already had those charts in her office she asked Diana, if it was possible to leave them there and Diana replied no. On Friday June 20th, I separated all Brooklyn AOT and Non-Medicaid Charts and labeled them as such( I videotaped my work for proof). The following Monday as she has done every morning she confronted me as to why the charts were not separated? I asked if she did not see the section labeled Brooklyn? She then went to the other supervisor asked if she understood the instructions to which the other supervisor told her your instructions were not clear. Diana subsequently moved the charts one section over and they are in the same exact manner I first put them. I asked Diana to give all instructions in writing, but she refused.

On July 20th 2014, I was called into the office my Elaine Fox and Diana Musca and was told it was my last day of employment, because I was not a good fit. I asked if I was eligible for unemployment and Helaine said certainly.

On July 21st I wrote an email to Helaine asking for the specific reason for my termination, however, I received an auto response to contact her assistance Ahilia. I wrote to Ahila, she informed me Helaine is out on vacation, but she would forward my request to her.

From:drmcleods@hotmail.com
To: hfox@pgcmh.org
Subject: Reason For Termination
Date: Sun, 20 Jul 2014 19:04:29 -0400

Hi Helaine,

I was wondering if it is possible for you to give me a specific reason for termination.

You suggested in the meeting on Thursday, that Diana and Marcia discussed a few issues.

I would appreciate it if you can tell me what those issues were. My reputation has been impeccable as you can see from my letters of recommendation and I intend to keep it that way by any means necessary.

Thank you in advance.

Dr. Sharon B. McLeod

Automatic reply: Reason For Termination

From:      **Helaine Fox** (hfox@pgcmh.org)

Sent:      Sun 7/20/14 7:04 PM

To:        sharon McLeod (drmcleods@hotmail.com)

I will be on vacation from July 20th through July 25th returning to the office on July 27th. If you need an immediate response, please contact Alhia Harris at aharris@pgcmh.org and she will direct your question to the appropriate person in my absence.

Thanks!

FW: Reason For Termination

FW: Reason For Termination

Actions

Alhia Harris (aharris@pgcmh.org)

Add to contacts

7/21/14

To: drmcleods@hotmail.com

Show this message...



From:   **Alhia Harris** (aharris@pgcmh.org)

Sent:    Mon 7/21/14 9:15 AM

To:       drmcleods@hotmail.com (drmcleods@hotmail.com)

Good morning,

Helaine is on vacation right now, but once she gets back, I will inform her about the letter you sent her.

Best,

Alhia Harris

Alhia D. Harris

Human Resources Coordinator

Postgraduate Center for Mental Health

158 East 35th Street

New York, New York 10016

(212) 889-5500, x 209

From: Sharon McLeod
Sent: Wednesday, June 04, 2014 6:20 PM
To: Dianna Musca
Cc: Marcia Holman; Mary McGovern
Subject: Kamal's client Survey

Hi Diana,

As per conversation I spoke with the flowing clients; As per Mary's recommendation the following questions were asked:

How long has he been their care Coordinator, Change in Service, level of service provided and last contact. All the clients I spoke with so far confirmed he has been consistent in his visits up until last Month and they are very pleased him and his service. I asked a few to describe him and they said he was the "African American guy with the braid and baseball cap". New patient Curtis V said he has been terrific in helping him. He was just released from jail after 15 years. Kamal and myself has research and submitted a lot of information on ex-offender programs to the client to which he says he appreciated. During his weekly supervision he appears to know his clients and cares about them. I will continue to follow-up the clients I did not get in touch with. Client Jan I. complained of inadequate service due to Kamal not able to get housing. However, according to the notes and conversation with Kamal, she is on the waitlist for housing and is very particular about living in Manhattan., to which she confirmed with me. I left a message for the her therapist to contact me, because Kamal said she is Borderline and splits a lot

1. Felicito A ( admit to program 1/20/12)

2. Francis C

3. James H

4. Jack H

5. Patterson T

6. Jan L

7. Justine ( Mary spoke with client)

8. Catherine P

9. Lakesha L. ( no answer)

2015 FEB 27 P 2:49
SDNY PRO SE OFFICE
RECEIVED

10. Michael B. (Discharge from Woodhull yesterday. Has been followed inpatient by Carlos. Client wishes to continue services with Kamal)

11. Hector C: answering machine no message left.

12. Dunham C : Answering machine no message left

13. Dante E

14. Miguel S: In Riker's since May

15 Terrance P.

15. Michael P: called in Am and PM hanged up phone.

16. Rick S.

17. Curtis V. ( NEW Client started in May)

18. Jeffrey W

He has one client lost to service Moshe B. Client has not returned to the shelter, since May 21. Myself and Kamal has followed-up with the Atlantic Avenue shelter supervisor Ms. Johnson and the Client's mother and father almost daily for the last two weeks. Family has our contact numbers and the Supervisor at the Shelter as well. Client goes to see his mother about once per week, he informs his mother he sleeps and the shelter, but he does not. He is currently not in any hospitalized. Client's mother said she will keep us updated as to his whereabouts as soon as she finds out.

P.S. I would like to clarify the questions asked by Marcia yesterday. I did suggest to Mary that I should probably called his clients. I was told by Mary, it would not do any good, because it would be the client's word against his. As per Mary, the best thing to do is wait until the end of the month and write him up for inadequate paperwork. I told her I was comfortable in firing him because I did know the severity of his illness and had safety concerns. Mary said just do the paper work and she will fire him. That is what I proceeded to do. I did however during our supervision felt he was credible in his presentation and has seen improvement in his overall demeanor, since my first day. I took the approach as a supporter, because I did want him to see me as an aggressor.

Since my first interaction with him I told May I was concerned. I had a meeting with Mary and Elena (she supervise him after Tom left), Elena said she had the same concern, however, he was many write ups and needed only one to be fired. The solution at that time, was to write him up again if he falls behind. All staff at the one and one meeting I had with them during my first week, raised the concern of his deterioration. I again addressed the situation with Mary and was told he was referred for counseling. I was told by all staff this issue was raised with Tom on several occasions and with Mary as

well. At our last end of month meeting, he had a similar outburst, I again address the situation, with Mary and Elena. Yesterday after the meeting, the staff came to my office and voice their concern out of compassion and I told Antonette to speak to Mary. Again, Antonette said she was told by Mary, he was referred for help.

I spoke with him at length yesterday. There are still some concern of Paranoid features in his behavior. He said he gets anxious in an enclosed space and crowded space, but as learned to control his anxiety. He will go to the Urgent Care One Medical, as he has always done when he gets the $200 fee require per year. He does not want to use his private insurance because of deductibles. He is also planning on seeing an Iridologist, who can look into his eyes and tell genetic changes taking place within him, which started in 2012.

The plan is to continue to provide as much support as possible, to alleviate any additional possible stressors. Also daily contact and supervision. He is currently working on the missing paperwork and the staff are very supportive and are and were always willing to support him. Most have worked with him for several years and are willing to take on additional cases until a new staff is hired. I believe Anetta has finished her audit and I will solicit her help in assisting him with the audit. I will also continue to solicit Carlos's help in monitoring his high risk client's and give me daily feedback.

Any additional suggestions will be appreciated.

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865
Counsel for Defendants:
    Michael L. Abitabilo

-----------------------------------------------------------------x

SHARON McLEOD,
                      : 

             Plaintiff,         : Case No. 14 CV. 10041 (LAP)

  - against -

POSTGRADUATE CENTER FOR MENTAL
HEALTH, HELAINE FOX, MARCIA HOLMAN,
DIANA MUSCA and MARY McGOVERN,

             Defendants.     :

-----------------------------------------------------------------x

## DEFENDANTS' ANSWER TO PLAINTIFF'S
## AMENDED COMPLAINT FILED FEBRUARY 27, 2015

      Defendants, Postgraduate Center For Mental Health, Marcia Holman, and Diana

Musca (hereinafter "Defendants"), by and through their attorneys, Jackson Lewis P.C., for their

Answer to Plaintiff's *Pro Se* Amended Complaint filed February 27, 2015 (ECF Document 5)

(hereinafter referred to as the "Amended Complaint") herein state as follows:

          1.     Defendants deny the allegations contained in the introductory paragraphs

and statutory bases contained on page 1 of the *Pro Se* Amended Complaint.

          2.     Defendants deny knowledge or information sufficient to form a belief as

to the allegations set forth in the "Parties in this Complaint," Paragraph I.A. on page 2 of the *Pro

Se* Amended Complaint.

          3.     Defendants deny the allegations set forth in Paragraph I.B. on page 2 of

the *Pro Se* Amended Complaint, except admit Defendant Postgraduate Center for Mental Health

maintains a business address at 71 West 23rd Street, 7th Floor, New York, New York 10010, and avers that its corporate name is Postgraduate Center for Mental Health and its corporate headquarters is located at 158 East 35th Street, New York, N.Y. 10016.

4.       Defendants deny the allegations set forth in Paragraph I.C. on page 2 of the *Pro Se* Second Amended Complaint, except admit that Plaintiff was employed by Defendant Postgraduate Center for Mental Health.

5.       Defendants deny the allegations set forth in the "Statement of the Claim," Paragraph II.A. on pages 2-3 of the *Pro Se* Amended Complaint including the "attached facts" referred to therein.

6.       Defendants deny the allegations set forth in Paragraph II.B. on page 3 of the *Pro Se* Amended Complaint including the "attached facts" referred to therein.

7.       Defendants deny that a response to Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in   Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint.

8.       Defendants deny that a response to Paragraph II.D. on page 3 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in   Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint.

9.       Defendants deny the allegations set forth in Paragraph II.E. on page 3 of the *Pro Se* Amended Complaint, including the "attached facts" referred to therein.

10.       Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the "Exhaustion of Federal Administrative Remedies," Paragraph III.A. on page 3 of the *Pro Se* Amended Complaint.

- 2 -

11.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph III.B. on page 4 of the *Pro Se* Amended Complaint.

12.    Defendants deny that a response to Paragraph III.C. on page 4 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in Paragraph III.C. on page 4 of the *Pro Se* Second Amended Complaint.

13.    Defendants deny each and every allegation and demand for relief set forth in the "Relief," Paragraph IV on page 4 of the *Pro Se* Amended Complaint.

14.    Defendants deny the allegations set forth in the typed statements and attachments annexed to the *Pro Se* Amended Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

15.    The Amended Complaint fails, in whole or in part, to state any claim against Defendants upon which relief can be granted or for which the damages sought can be awarded.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

16.    At all time relevant hereto, Defendants have acted in good faith based on reasonable factors other than any disability, perceived disability, and/or any other protected characteristics, or in retaliation for any protected conduct, and has not violated any rights which may be secured to Plaintiff under any federal, State, city or local laws, rules, regulations, codes or guidelines.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

17.    Plaintiff's claims for damages against Defendants are barred, in whole or in part, because she has failed to mitigate her alleged damages.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

18.     Plaintiff's claims against Defendants are barred, in whole or in part, by the applicable statutes of limitations.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

19.     Plaintiff's Amended Complaint should be dismissed because all actions taken by Defendants with respect to Plaintiff were undertaken in good faith for legitimate business reasons unrelated to any protected characteristic, or in retaliation for any protected conduct.

## AS AND FOR AN SIXTH AFFIRMATIVE DEFENSE

20.     Plaintiff's claims are barred, in whole or in part, by her failure to satisfy the jurisdictional prerequisites and/or conditions precedent to filing an action under the statues Plaintiff purports to sue hereunder.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

21.     Plaintiff's claims are barred, in whole or in part, by the exclusive remedies provision of the New York State Workers' Compensation Law.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

22.     Plaintiff's claims are barred, by whole or in part, by the applicable statutes of limitations.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

23.     Plaintiff's claim harassment claim(s) is barred and/or any recovery of damages is precluded because Plaintiff unreasonably failed to take advantage of Defendant's preventive and corrective opportunities or to avoid harm otherwise.

WHEREFORE, Defendants respectfully request that this Court:

1. Dismiss Plaintiff's *Pro Se* Amended Complaint in its entirety and all claims for relief set forth therein, with prejudice;

2. Deny each and every demand for relief as set forth in Plaintiff's *Pro Se* Amended Complaint;

3. Grant such other and further relief as this Court may find to be just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.

44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865

By: _____

Michael L. Abitabilo
*Attorneys for Defendants*

Dated:   November 25, 2015
White Plains, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865
Counsel for Defendants:
    Michael L. Abitabilo

-------------------------------------------------------------------x

SHARON McLEOD,                         :

                     Plaintiff,        :  Case No. 14 CV. 10041 (LAP)

   - against -                    :

POSTGRADUATE CENTER FOR MENTAL    :
HEALTH, HELAINE FOX, MARCIA HOLMAN,   :
DIANA MUSCA and MARY McGOVERN,     :

                   Defendants.   :

-------------------------------------------------------------------x

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of Defendants' Answer to the *Pro Se*

Amended Complaint was served via FedEx on November 25, 2015, upon Plaintiff Sharon

McLeod at the following addresses:

150 Ocean Avenue, 1G
Brooklyn, New York 11225
Plaintiff *Pro Se*

                                          _____
                                          Michael L. Abitabilo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865
Counsel for Defendants:
    Michael L. Abitabilo
-------------------------------------------------------------------x
SHARON McLEOD,                                  :
                                                :
                        Plaintiff,              : Case No. 14 CV. 10041 (LAP)
                                                :
    - against -                                 :
                                                :
POSTGRADUATE CENTER FOR MENTAL                  :
HEALTH, HELAINE FOX, MARCIA HOLMAN,             :
DIANA MUSCA and MARY McGOVERN,                  :
                                                :
                        Defendants.             :
-------------------------------------------------------------------x

### DEFENDANTS' ANSWER TO PLAINTIFF'S
### AMENDED COMPLAINT FILED FEBRUARY 27, 2015

Defendants, Helaine Fox and Mary McGovern (hereinafter "Defendants"), by and

through their attorneys, Jackson Lewis P.C., for their Answer to Plaintiff's *Pro Se* Amended

Complaint filed February 27, 2015 (ECF Document 5) (hereinafter referred to as the "Amended

Complaint") herein state as follows:

1.    Defendants deny the allegations contained in the introductory paragraphs

and statutory bases contained on page 1 of the *Pro Se* Amended Complaint.

2.    Defendants deny knowledge or information sufficient to form a belief as

to the allegations set forth in the "Parties in this Complaint," Paragraph I.A. on page 2 of the *Pro

Se* Amended Complaint.

3.     Defendants deny the allegations set forth in Paragraph I.B. on page 2 of the *Pro Se* Amended Complaint, except admit Defendant Postgraduate Center for Mental Health maintains a business address at 71 West 23rd Street, 7th Floor, New York, New York 10010.

4.     Defendants deny the allegations set forth in Paragraph I.C. on page 2 of the *Pro Se* Second Amended Complaint, except admit that Plaintiff was employed by Defendant Postgraduate Center for Mental Health.

5.     Defendants deny the allegations set forth in the "Statement of the Claim," Paragraph II.A. on pages 2-3 of the *Pro Se* Amended Complaint including the "attached facts" referred to therein.

6.     Defendants deny the allegations set forth in Paragraph II.B. on page 3 of the *Pro Se* Amended Complaint including the "attached facts" referred to therein.

7.     Defendants deny that a response to Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint.

8.     Defendants deny that a response to Paragraph II.D. on page 3 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in Paragraph II.C. on page 3 of the *Pro Se* Second Amended Complaint.

9.     Defendants deny the allegations set forth in Paragraph II.E. on page 3 of the *Pro Se* Amended Complaint, including the "attached facts" referred to therein.

10.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the "Exhaustion of Federal Administrative Remedies," Paragraph III.A. on page 3 of the *Pro Se* Amended Complaint.

11.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph III.B. on page 4 of the *Pro Se* Amended Complaint.

12.     Defendants deny that a response to Paragraph III.C. on page 4 of the *Pro Se* Second Amended Complaint is necessary, as Plaintiff did not assert any allegations therein. To the extent a response is necessary, Defendants deny the allegations contained in Paragraph III.C. on page 4 of the *Pro Se* Second Amended Complaint.

13.     Defendants deny each and every allegation and demand for relief set forth in the "Relief," Paragraph IV on page 4 of the *Pro Se* Amended Complaint.

14.     Defendants deny the allegations set forth in the typed statements and attachments annexed to the *Pro Se* Amended Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

15.     The Amended Complaint fails, in whole or in part, to state any claim against Defendants upon which relief can be granted or for which the damages sought can be awarded.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

16.     At all time relevant hereto, Defendants have acted in good faith based on reasonable factors other than any disability, perceived disability, and/or any other protected characteristics, or in retaliation for any protected conduct, and has not violated any rights which may be secured to Plaintiff under any federal, State, city or local laws, rules, regulations, codes or guidelines.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

17.     Plaintiff's claims for damages against Defendants are barred, in whole or in part, because she has failed to mitigate her alleged damages.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

18.     Plaintiff's claims against Defendants are barred, in whole or in part, by the applicable statutes of limitations.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

19.     Plaintiff's Amended Complaint should be dismissed because all actions taken by Defendants with respect to Plaintiff were undertaken in good faith for legitimate business reasons unrelated to any protected characteristic, or in retaliation for any protected conduct.

## AS AND FOR AN SIXTH AFFIRMATIVE DEFENSE

20.     Plaintiff's claims are barred, in whole or in part, by her failure to satisfy the jurisdictional prerequisites and/or conditions precedent to filing an action under the statues Plaintiff purports to sue hereunder.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

21.     Plaintiff's claims are barred, in whole or in part, by the exclusive remedies provision of the New York State Workers' Compensation Law.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

22.     Plaintiff's claims are barred, by whole or in part, by the applicable statutes of limitations.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

23.     Plaintiff's claim harassment claim(s) is barred and/or any recovery of damages is precluded because Plaintiff unreasonably failed to take advantage of Defendant Postgraduate Center for Mental Health's preventive and corrective opportunities or to avoid harm otherwise.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

24.     Plaintiff's claims against Defendants are barred by insufficient service of process.

WHEREFORE, Defendants respectfully request that this Court:

1.     Dismiss Plaintiff's *Pro Se* Amended Complaint in its entirety and all claims for relief set forth therein, with prejudice;

2.     Deny each and every demand for relief as set forth in Plaintiff's *Pro Se* Amended Complaint;

3.     Grant such other and further relief as this Court may find to be just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.

44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865

By: _____
Michael L. Abitabilo
*Attorneys for Defendants*

Dated:   November 25, 2015
White Plains, New York

- 5 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS P.C.
44 South Broadway, 14th Floor
White Plains, New York 10601
(914) 872-6865
Counsel for Defendants:
    Michael L. Abitabilo
-----------------------------------------------------------------x
SHARON McLEOD,                                    :
                                                  :
                        Plaintiff,                : Case No. 14 CV. 10041 (LAP)
                                                  :
    - against -                                   :
                                                  :
POSTGRADUATE CENTER FOR MENTAL                    :
HEALTH, HELAINE FOX, MARCIA HOLMAN,               :
DIANA MUSCA and MARY McGOVERN,                    :
                                                  :
                        Defendants.               :
-----------------------------------------------------------------x

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Answer to the *Pro Se*

Amended Complaint was served via FedEx on November 25, 2015, upon Plaintiff Sharon

McLeod at the following addresses:

150 Ocean Avenue, 1G
Brooklyn, New York 11225
Plaintiff *Pro Se*

_____
Michael L. Abitabilo

# Exhibit D

**[Exhibit D Subject to Motion to File Under Seal]**

# Exhibit E

**Abitabilo, Michael L. (White Plains)**

Vartges:

Thank you for your messages. Please advise your client that we believe we have an enforceable settlement agreement, and will ask the court to enforce the agreement based on the term sheet the parties executed on Friday. Please let me know what your involvement will be, if any, moving forward. Thank you for your cooperation and professionalism throughout this process.


Michael L. Abitabilo
Attorney at Law
Jackson Lewis P.C.
44 South Broadway, 14th Floor
White Plains, NY 10601-2329

914.872.6865 | Direct
914.946.1216 | Fax

michael.abitabilo@jacksonlewis.com

www.jacksonlewis.com

**From:** Vartges Saroyan [mailto:vartges.saroyan@gmail.com]
**Sent:** Monday, May 23, 2016 3:32 PM
**To:** Abitabilo, Michael L. (White Plains)
**Subject:** Update

Hi Mr. Abitabilo,

Per the voicemail I left on your work phone earlier today, my client advises me that she has had a change of heart and would like to decline the offer. Rather than continue to discuss settlement offer amounts, she wants to proceed with litigation. I will soon notify the pro se office of these developments.

I regret that we can ultimately could not resolve this matter out of court. Feel free to contact me with any questions. Best of luck to you and your clients.

Sincerely,
Vartges

646-643-3863

1

# Exhibit F

**Abitabilo, Michael L. (White Plains)**

| | |
|---|---|
| **From:** | Vartges Saroyan <vartges.saroyan@gmail.com> |
| **Sent:** | Thursday, May 26, 2016 3:26 PM |
| **To:** | Abitabilo, Michael L. (White Plains) |
| **Cc:** | Russell D. Morris |
| **Subject:** | Re: Update |
| | |
| **Categories:** | ViewMail |

I spoke with Ms. McLeod, and she asked me to note that she would not settle the case for less than 65% of $████ In light of last Friday's mediation, she understands that defendants are exceedingly unlikely to offer that amount and understands that they may proceed by seeking to enforce the term sheet. She further understands that for all intents and purposes, this case is no longer in mediation and I will no longer represent her. Please direct any future communication to her directly.

Russell, if you think there is a need to update the mediation office as to these developments, I would appreciate your doing so.

If either of you have any mediation-related questions, please let me know. It was a pleasure working with the both of you.

Sincerely,
Vartges

646-643-3863

On Thu, May 26, 2016, 10:20 Abitabilo, Michael L. (White Plains) <Michael.Abitabilo@jacksonlewis.com> wrote:

> Ok; we will hold off until after Friday and hope to hear from you. If not, we will submit a letter to the court on Tuesday morning. Thank you.

Michael L. Abitabilo
Attorney at Law
Jackson Lewis P.C.
44 South Broadway, 14th Floor

White Plains, NY 10601-2329

914.872.6865 | Direct
914.946.1216 | Fax

michael.abitabilo@jacksonlewis.com

www.jacksonlewis.com

**From:** Vartges Saroyan [mailto:vartges.saroyan@gmail.com]
**Sent:** Wednesday, May 25, 2016 3:58 PM
**To:** Abitabilo, Michael L. (White Plains); Russell D. Morris
**Subject:** Re: Update

Gentlemen, I am sorting through things right now and will update you both by Friday.  Best,  Vartges

On Wed, May 25, 2016, 13:04 Abitabilo, Michael L. (White Plains) <Michael.Abitabilo@jacksonlewis.com> wrote:

Russell:

As I advised Vartges, we intend to seek enforcement of the settlement agreement.

Vartges, please let me know if your client's position has changed; otherwise, we will proceed with our enforcement efforts.

Michael L. Abitabilo
Attorney at Law
Jackson Lewis P.C.
44 South Broadway, 14th Floor
White Plains, N.Y. 10601

914.872.6865 | Direct
914.946.1216 | Fax

michael.abitabilo@jacksonlewis.com<mailto:michael.abitabilo@jacksonlewis.com>

www.jacksonlewis.com<http://www.jacksonlewis.com>

On May 25, 2016, at 12:59 PM, Russell D. Morris <rmorris@russellmorrislaw.com<mailto:rmorris@russellmorrislaw.com>> wrote:

Mike and Vartages,

What's the status of this – you'll see that the Court entered a 30 day order.  See attached.

Best,

-Russell

From: Vartges Saroyan [mailto:vartges.saroyan@gmail.com]
Sent: Monday, May 23, 2016 3:46 PM
To: Russell D. Morris
Subject: Fwd: Update

FYI
---------- Forwarded message ---------
From: Vartges Saroyan <vartges.saroyan@gmail.com<mailto:vartges.saroyan@gmail.com>>
Date: Mon, May 23, 2016, 15:32
Subject: Update
To: Michael Abitabilo <michael.abitabilojacksonlewis.com<mailto:michael.abitabilo@jacksonlewis.com>>

Hi Mr. Abitabilo,

Per the voicemail I left on your work phone earlier today, my client advises me that she has had a change of heart and would like to decline the offer. Rather than continue to discuss settlement offer amounts, she wants to proceed with litigation. I will soon notify the pro se office of these developments.

I regret that we can ultimately could not resolve this matter out of court. Feel free to contact me with any questions. Best of luck to you and your clients.

Sincerely,
Vartges

646-643-3863
<2016-05-24 30 Day Order.pdf>


Representing management exclusively in workplace law and related litigation


Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

3

# Exhibit G

**Citation #1**
**2013 U.S. Dist. LEXIS 10778**



Positive
As of: Jun 15, 2016

**RUFINO CARDONA and NILDA CARDONA, Plaintiffs, v. COMMUNITY AC-
CESS, INC. and CARL JOHNSON, Defendants.**

**11-CV-4129 (MKB)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK**

**2013 U.S. Dist. LEXIS 10778**

**January 25, 2013, Decided
January 25, 2013, Filed**

**PRIOR HISTORY:** Cardona v. Cmty. Access, Inc.,
2011 U.S. Dist. LEXIS 139807 (E.D.N.Y., Dec. 5, 2011)

**CORE TERMS:** settlement agreement, summary judg-
ment, disability, citations omitted, intentional infliction
of emotional distress, settlement, Rehabilitation Act,
conspiracy, guest, cause of action, statute of limitations,
tenants, accommodation, receptionist's, fraudulent con-
cealment, assault and battery, Privacy Act, civil rights,
pro se, res judicata, reasonable accommodation, incom-
petent, alteration, assaulted, disparate, anxiety, invasion
of privacy, emotional distress, attorney general, outra-
geous

**COUNSEL:** [*1] Rufino Cardona, Plaintiff, Pro se,
Brooklyn, NY.

Nilda Cardona, Plaintiff, Pro se, Brooklyn, NY.

For Community Access, Inc., Carl Johnson, Defendants:
Jeffrey A. Marshall, Marshall, Conway, & Bradley, New
York, NY.

**JUDGES:** Margo K. Brodie, United States District
Judge.

**OPINION BY:** Margo K. Brodie

**OPINION**

**MEMORANDUM & ORDER**

MARGO K. BRODIE, United States District Judge:

Plaintiffs Rufino Cardona and Nilda Cardona bring
the above-captioned action against Defendants Commu-
nity Access, Inc. ("Community Access") and Carl John-
son. Plaintiffs allege that Defendants engaged in dis-
criminatory practices in violation of the Fair Housing
Act, 42 U.S.C. § 3601 et seq. (the "FHA"), the Ameri-
cans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the
"ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. §
794 et seq. (the "Rehabilitation Act"). Plaintiffs also as-
sert claims for invasion of privacy, intentional infliction
of emotional distress, fraudulent concealment, discrimi-
nation, negligence, assault and battery, and conspiracy,
all under New York law. In addition, Plaintiffs purport to
bring a claim for violation of the Privacy Act of 1974, 5
U.S.C. § 552a. Defendants moved for summary judg-
ment. Plaintiffs seek sanctions based on [*2] the theory
that Defendants' summary judgment motion is frivolous.
For the reasons set forth below, the Court grants De-
fendants' motion for summary judgment and denies
Plaintiffs' motion for sanctions.

**I. Background**

Plaintiffs are a couple currently residing in a build-
ing owned and operated by Defendant Community Ac-
cess. (Am. Compl. ¶ 4.) Defendant Community Access is
a not-for-profit organization "concentrating in the field of
supportive housing and peer employment training pro-
grams for New Yorkers who live with a psychiatric disa-

bility." (Def 56.1 ¶ 2.) Defendant Carl Johnson is an employee of Community Access.[1] (*Id.*)

> 1   The Complaint initially named Defendant Johnson and another Community Access employee Lesha Battle, sued as "Jane" Battle (who is now deceased). (Compl. ¶¶ 4-6.) However, in the Amended Complaint, Defendant Johnson is the only Community Access employee named as a defendant. (Am. Compl. ¶¶3-5.)

As a factual basis for all of their claims, Plaintiffs allege that (1) they have been denied "their right to have guest [sic] visit without signing a log book at the receptionist desk, yet permitting non-Hispanic, non-disabled and gay guest [sic] of other tenants to forego sign-in [*3] and freely enter;" (2) "Plaintiffs are not permitted to have the receptionist's electric door buzzed open for Hispanics tenants;" (3) Plaintiff Rufino Cardona was assaulted by Defendant Johnson and "non-Hispanic tenants are not physically abused;" (4) "In hopes of outstintg [sic] the plaintiffs from the apartments, defendants, upon information and belief, has [sic] employed gay and/or homosexual non-Hispanics to engage in a systematic scheme of harassment, and abuses directed towards the plaintiffs. Furthermore, upon information and belief, defendant hires employees who are directly members of or the employees of defendant [to] assist illicit drug dealers in the dwelling." (Am. Compl. ¶ 8.) Plaintiffs claim that all of the events "have existed since the plaintiffs 1st filing before the court in *Cardona, etal* [sic] *vs. Community Access, Inc., etal* [sic],[] docket no. 90-CV-3148 (CBA-RLM) (EDNY, 10/29/2009) and up to the current time, and hasn't ceased." (*Id.*)

This is Plaintiffs' second suit alleging similar facts. On July 13, 2009, Plaintiffs filed suit against Defendant Community Access and another entity (the "2009 Litigation"). (Def. 56.1 ¶ 3.) In the 2009 Litigation, Plaintiffs alleged [*4] that they were not allowed to live together as husband and wife and that Defendants "(1) forced plaintiffs, both tenants, to sign logbooks [sic] entering their building, (2) made plaintiffs [sic] guests to leave the building without rational reasons; (3) neglected, failed or refused to alert plaintiffs of the presence of guests attempt at visiting; [and] (4) made direct indirect threats against the plaintiffs." (Weissman Decl. Ex. C (2009 Compl. ¶ 1).)

After two settlement conferences, on October 29, 2009, the parties filed a Stipulation of Settlement with a Confidential Release (collectively the "Settlement Agreement"). The Confidential Release was incorporated by reference into the Stipulation of Settlement and released the named defendants and various individuals associated with the named defendants including their employees from "any and all existing or possible" claims arising from their tenancies at buildings run by Defendant Community Access. (No. 09-CV-3148 Docket Entry No. 24; Weissman Decl. Ex. E (Stipulation of Settlement and Confidential Release).) The Settlement Agreement dismissed the 2009 Litigation with prejudice. (Weissman Decl. Ex. F.) On October 30, 2009, United States [*5] District Judge Carol Bagley Amon entered an order dismissing the case in light of the settlement. (No. 09-CV-3148 Docket Entry No. 25.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Redd v. N. Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012)*; *Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011)*. The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson, 477 U.S. at 252*. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function [*6] is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000)*.

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)* (alteration in original) (quoting *Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)*; *see also Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*)); *Thompson v. Tom Vazquez Janitorial, No. 05-CV-808, 2006 U.S. Dist. LEXIS 85931, 2006 WL 3422664, at *2 (E.D.N.Y. Nov. 28, 2006)* (noting that a court "must construe the *pro se* plaintiff's claims liberally in deciding the motion for summary judgment" (citing *Sawyer v. Am. Fed'n of Gov't Emps.,*

*AFL-CIO*, 180 F.3d 31, 36 (2d Cir. 1999))) "This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated." [*7] *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

**b. FHA Claim**

Plaintiffs bring a FHA claim against the Defendants.[2] Plaintiffs argue that they were treated differently than non-Hispanic, non-disabled, homosexual individuals. (Am. Compl ¶ 8.) For example, their guests had to sign the guest book and Plaintiffs' guests were not buzzed into the building. (*Id*.) Defendants argue that Plaintiffs' FHA claims are precluded by the Settlement Agreement from the 2009 Litigation. Defendants are correct. Under New York law, res judicata bars a plaintiff from bringing "a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief.'" *Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 277 (E.D.N.Y. 2009) (quoting *Burka v. N.Y.C. Transit Auth.*, 32 F.3d 654, 657 (2d Cir. 1994)). Because the Plaintiffs' FHA claims arise from facts that pre-dated the Settlement Agreement, Plaintiffs are precluded from bringing this claim.

> 2    The FHA "prohibits discrimination in the housing market based on, inter alia, race, color, religion, sex, national origin, or disability." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 419 (2d Cir. 2005).

"A [*8] dismissal with prejudice is *res judicata* not only as to the matters actually litigated in the previous action, 'but as to all relevant issues which could have been but were not raised and litigated in the suit.'" *Samuels v. N. Telecom, Inc.*, 942 F.2d 834, 836 (2d Cir. 1991) (citations omitted); *see also Reyes*, 661 F. Supp. 2d at 277 (noting that "New York courts apply a transactional analysis of *res judicata*" meaning that all claims that arise out of "the same factual grouping" as an earlier decided claim is barred (quoting *Burka*, 32 F.3d at 657)); *Res. NE. of Long Island, Inc. v. Town of Babylon*, 28 F. Supp. 2d 786, 792 (E.D.N.Y. 1998) ("[O]nce a claim is brought to its final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if the latter are based on different theories, seek different remedies, or allege different facts.").

Settlement agreements entered as stipulations of dismissals with prejudice preclude all claims that could have been brought at the time of the settlement. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286-87 (2d Cir. 2002) ("It is clear that a dismissal, with prejudice, arising out of a settlement [*9] agreement operates as a final judgment for res judicata purposes."); *Muhammad v. City of Peekskill*, No. 06-CV-1899, 2008 U.S.

Dist. LEXIS 76894, 2008 WL 4452355, at *4 (S.D.N.Y. Sept. 30, 2008) ("The stipulation dismissing plaintiff's 'action' with prejudice must be read to have dismissed all claims,' which precludes Plaintiff later raising 'those claims that would have been decided had the first action been fully litigated.'" (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)); *Waldman v. Vill. of Kiryas Joel*, 39 F. Supp. 2d 370, 377 (S.D.N.Y. 1999) ("[A] stipulation of dismissal with prejudice is considered a final judgment on the merits for purposes of *res judicata*, as is a settlement agreement, unless the parties provide otherwise.").

The settlement would preclude not only claims against the named defendants in the prior action, but also those in privity with the named defendants. *Muhammad*, 2008 U.S. Dist. LEXIS 76894, 2008 WL 4452355, at *4-5 ("Plaintiff is barred from making claims against the same party and those in privity with that party." (citing *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 367-68 (2d Cir. 1995)). Therefore, the Settlement Agreement would prevent claims against Defendant Johnson [*10] as well as Defendant Community Access.

"Settlement agreements are strongly favored . . . and may not be lightly cast aside. Afterthought or change of mind are not sufficient to justify rejecting a settlement. A court may relieve a party of the consequences of a settlement agreement '[o]nly where there is cause sufficient to invalidate a contract, such as fraud, collusion, mistake or accident . . . .'" *Willgerodt on Behalf of Majority Peoples' Fund for the 21st Century, Inc. v. Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997) (alteration in original) (citations omitted); *see also Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007) ("Consequently, a 'voluntary, clear, explicit, and unqualified stipulation of dismissal entered into by the parties in court and on the record is enforceable even if the agreement is never reduced to writing, signed, or filed.' The settlement remains binding even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to writing." (citations omitted); *Collick v. United States*, 552 F. Supp. 2d 349, 352 (E.D.N.Y. 2008) ("Settlement agreements to end litigation are strongly favored by courts and are not lightly [*11] cast aside. Once reached by the parties, settlement agreements are binding and enforceable."). Further, "[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Collick*, 552 F. Supp. 2d at 352.

Plaintiffs signed the Settlement Agreement from the 2009 Litigation. As part of the Settlement Agreement, Plaintiffs released Defendants from liability from all claims related to the 2009 Litigation.[3] In their response papers, Plaintiffs argue that the Settlement Agreement is

not binding because they did not have the legal capacity to negotiate due to their incompetence. (P1. Opp'n App. (part I) at 2.). In order to overturn the validity of the Settlement Agreement, Plaintiffs must demonstrate that they had an incapacitating disability at the time they entered into the Settlement Agreement and that Defendants knew of their disability. *See Reid v. IBM Corp., No. 95-CV-1755, 1997 U.S. Dist. LEXIS 8905, 1997 WL 357969, at *7 (S.D.N.Y. June 26, 1997)* ("[F]or the Release to be voidable, plaintiff must demonstrate both the incapacitating disability and that defendant had reason to know of this disability."). "The party asserting incompetence must prove [*12] that status at the time of the disputed transaction, . . . an extremely heavy [burden]." *Reid, 1997 U.S. Dist. LEXIS 8905, 1997 WL 357969, at *7-8* (citations omitted); *see also Colburn Family Found. v. Chabad's Children of Chernobyl, 739 F. Supp. 2d 614, 618-19 (S.D.N.Y. 2010)* ("A party seeking to void a contract bears the burden of proving that the contract is invalid."); *Rudolf Nureyev Dance Found v. Noureeva-Francois, 7 F. Supp. 2d 402, 415 (S.D.N.Y. 1998)* ("Parties are presumed to be competent, and a party asserting incapacity has the burden of proving incompetence."). Furthermore, "[i]f the releasing party does not promptly repudiate the contract or release, he will be deemed to have ratified it." *Colburn Family Found, 739 F. Supp. 2d at 618-19.*

3    The validity of releases for actions in federal court is governed by federal common law; however, federal courts rely on state law to help determine the contents of federal common law. *Twine v. Four Unknown N.Y. Police Officers, No. 10-CV-6622, 2012 U.S. Dist. LEXIS 176048, 2012 WL 6184014, at *7 (S.D.N.Y. Dec. 12, 2012)* (citing *Olin Corp. v. Consol. Aluminum Corp., 5 F.3d 10, 15 (2d Cir. 1993)*). As with settlement agreements in general, releases are given considerable deference and are not lightly [*13] repudiated. *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A., 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008)* ("New York law also recognizes that "a clear and unambiguous release . . . should be enforced according to its terms." (alteration in original) (quoting *Booth v. 3669 Delaware, 92 N.Y.2d 934, 935, 703 N.E.2d 757, 680 N.Y.S.2d 899 (1998)*); *Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 603 (S.D.N.Y. 2004)* ("By its terms, the Release is governed by New York law, and New York law favors the enforcement of valid releases: An unambiguous release should be enforced according to its terms." (internal quotation marks omitted) (quoting *Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 144 (2d Cir. 2000)*)); *Thailer v. LaRocca, 174*

*A.D.2d 731, 571 N.Y.S.2d 569, 571 (App. Div. 1991)* ("The general rule is that 'a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties.'"); *see also Watson v. City of New York, No. 11-CV-00335, 2012 U.S. Dist. LEXIS 171238, 2012 WL 6005781, at *1-4 (E.D.N.Y. Dec. 3, 2012)* (adopting report and recommendation enforcing settlement agreement which included a release of "all civil rights actions from the beginning of the world to [*14] present"). "[T]he meaning and scope of a release are determined within the context of the controversy being settled[.]" *Glassberg v. Lee, 82 A.D.3d 836, 918 N.Y.S.2d 554, 555 (App. Div. 2011)*.

The only evidence presented by Plaintiffs supporting their claim of incompetence is two letters from their physician dated June 12, 2012. Both letters state that Plaintiffs have been "diagnosed with 300.02 [g]eneralized anxiety disorder," are taking medication, and are "totally disabled and unable to work/receiving SSI benefits for disability." (P1. Opp'n App. (part III) at 1.) The letters state that Plaintiff Nilda Cardona has been the doctor's patient since January 2010 and Plaintiff Ruffino Cardona has been the doctor's patient since March of 2010; however, the letters do not address when Plaintiffs began to suffer from anxiety. (*Id.*) Plaintiffs' assertion that they suffer from anxiety is not enough to demonstrate that they suffered from a condition that was debilitating enough to prevent them from entering into the Settlement Agreement in October 2009. *See, e.g., Lang v. Tewksbury Twp., No. 10-CV-2564, 2012 U.S. Dist. LEXIS 18848, 2012 WL 503677, at *6 (D.N.J. Feb. 15, 2012)* ("While the Court does not doubt that Defendant suffers from [*15] serious and debilitating mental conditions . . . the record does not support a finding that he was unable to understand the terms of the settlement agreement to which he voluntarily agreed . . . ."); *Eddie v. Auto Truck Transp. Corp., No. 06-CV-0750, 2007 U.S. Dist. LEXIS 46603, 2007 WL 1874225, at *6 (W.D. Va. June 27, 2007)* (holding that a generalized statement that a party suffered from "'severe anxiety and depression,' and stating that she was not in 'any mental state' to enter into a contract . . . did not show that an agreement should be set aside"); *Rudolf Nureyev Dance Found., 7 F. Supp. 2d at 416* ("When attempting to deem a party incompetent, it is not sufficient to show a general lack of capacity; it must be shown that the person was incompetent at the time of the transaction. [For example,] 'persons suffering from a disease such as Alzheimer's are not presumed incompetent and may execute a valid deed.'" (citation omitted)); *Savoie v. Terrebonne Parish Sch. Bd., No. 98-CV-1006, 2000 U.S. Dist. LEXIS 1223, 2000 WL 136008, at *5 (E.D. La. Feb. 4,*

2000) (holding that the plaintiff's "letters from several doctors setting forth that [plaintiff] was suffering from depression, anxiety, and stress" which plaintiff argued hindered her ability [*16] to "consent in entering into the Settlement Agreement" were insufficient to convince the court "that a material issue of fact exists on this point"); *Reid, 1997 U.S. Dist. LEXIS 8905, 1997 WL 357969, at *7-8* ("Plaintiff has failed to present evidence sufficient to demonstrate that he had a mental disability when he entered the Release, or that that disability impaired his ability to act in a reasonable manner. . . . [because] '[m]ere evidence of diagnostic labels without content tying them to capacity to give valid consent is inadequate to create an issue as to the consequences of the disorders on an individual's capacity to give valid consent.'"); *Willgerodt, 953 F. Supp. at 560* ("There is no evidence, however, that [plaintiff]'s depression caused her to lack contractual capacity or that her agreement was the result of impulsive or irrational behavior beyond her control. . . . Treating depression as a basis for avoiding a contract would undermine '[t]he fundamental integrity and reliability of contracts.'" (alteration in original) (citation omitted)).[4]

> 4    Plaintiffs allege that because they were incompetent they should have had an attorney appointed in the 2009 Litigation. (P1. Opp. App. (part I) at 23.) As an  [*17] initial matter, even if it could be argued that the June 12, 2012 letters establish that Plaintiffs are currently incompetent, they fail to demonstrate that Plaintiffs were incompetent in 2009 when they signed the Settlement Agreement. (P1. Opp. App. (part III) at 1-2.) The letters do not speak to Plaintiffs' competence in 2009. (*Id.*) Moreover, there is no right to counsel in a civil case. *Martin Trigona v. Lavien, 737 F.2d 1254, 1260 (2d Cir. 1984).* A court cannot compel an attorney to take a civil case without a fee, *Mallard v. U.S. District Court, 490 U.S. 296, 310, 109 S. Ct. 1814, 104 L. Ed. 2d 318 (1989),* but it may "request an attorney to represent any person unable to afford counsel," *28 U.S.C. § 1915(e)(1).* In deciding whether to grant a request for counsel, the Court must first consider whether the plaintiff has met "a threshold showing of some likelihood of merit." *Johnston v. Genessee Cnty. Sheriff Maha, 606 F.3d 39, 41 (2d Cir. 2010)* (quoting *Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir 1989)).* If the Court finds that the plaintiff has met the threshold requirement, the Court should next consider "the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the  [*18] need for cross-examination will be the major proof presented . . . , the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination." *Johnston, 606 F.3d at 42* (quoting *Hodge v. Police Officers, 802 F.2d 58, 61-62 (2d Cir. 1986)).* There is no evidence in the record that Plaintiffs met these threshold requirements and should have been appointed counsel.

Thus, the letters presented by Plaintiffs are insufficient to repudiate the Settlement Agreement and Plaintiffs are bound by the Settlement Agreement. According to the terms of the Settlement Agreement and under res judicata, Plaintiffs are precluded from litigating all claims that arise from the same set of facts that gave rise to the 2009 Litigation. (Weissman Decl. Ex. E.) Precluded allegations include Plaintiffs' contentions that they have been denied "their right to have guest visit without signing a log book at the receptionist desk, yet permitting no-Hispanic, non-disabled and gay guest of other tenants to forego sign-in and freely enter[;]" and that "Plaintiffs are not permitted to have the receptionist's [*19] electric door buzzed open for Hispanics tenants[.]" (Am. Compl. ¶ 8.) These claims were explicitly presented in the 2009 Litigation, which Plaintiffs settled. Plaintiffs are also precluded from pursuing their claims that "defendants, upon information and belief, has [sic] employed gay and/or homosexual non-Hispanics to engage in a systematic scheme of harassment, and abuses directed towards the plaintiffs" and that there were drug dealers on the property. (*Id.*) According to Plaintiffs, these claims predated the 2009 Litigation; thus, they could have been brought in the 2009 Litigation. *See, e.g. Muhammad, 2008 U.S. Dist. LEXIS 76894, 2008 WL 4452355, at *4-5* (holding that the plaintiff was barred by the settlement agreement and release from bringing not only claims raised but also any claims that "could have been brought" in the first action); *Berrios v. State Univ. of N.Y. at Stony Brook, 518 F. Supp. 2d 409, 420 (E.D.N.Y. 2007)* ("Res judicata bars any claim that could have been raised prior to the Release date."). Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs' FHA claims are encompassed in the 2009 Litigation and barred by the Settlement Agreement. Therefore, the Court grants Defendants'  [*20] motion for summary judgment on the FHA claims.

## c. ADA and Rehabilitation Act Claims

Plaintiffs bring a disability discrimination claim under Title III of the ADA and § 504 of the Rehabilitation Act against the Defendants. Both the ADA and the Rehabilitation Act prohibit discrimination based on disability.[5] *See Roberts v. Royal Atl. Corp., 542 F.3d 363, 368 (2d Cir. 2008)* ("Title III of the ADA prohibits discrimi-

nation against individuals 'on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" (quoting 42 U.S.C. § 12182(a)); Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (stating that [a]lthough there are subtle differences between [the ADA and the Rehabilitation Act] the standards adopted . . . by [them] are generally the same[.]" (citation omitted)). Title III[6] and Rehabilitation Act[7] claims include claims for intentional discrimination, disparate impact, and failure to accommodate. Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) ("A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination [*21] (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" (quoting Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003))).

5  One of the primary differences between the ADA and the Rehabilitation Act is that the Rehabilitation Act only applies to federally-funded programs. Bryant v. N.Y. Educ. Dep't, 692 F.3d 202, 216 (2d Cir. 2012) ("To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege . . . that he or she is a person with disabilities . . . who has been denied benefits of or excluded from participating in a *federally funded* program or special service[.]" (emphasis added)).

6  "In order to state a claim for violation of Title III, which authorizes private actions only for injunctive relief, not monetary damages, a plaintiff must 'establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA[.]'" Krist v. Kolombos Rest. Inc., 688 F.3d 89, 94-95 (2d Cir. 2012) (quoting Roberts v. Royal Atl. Corp., 542 F.3d 363, 368 (2d Cir. 2008)); [*22] *see also* Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008) (outlining the test for disability discrimination).

7  "To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege: [1] that he or she is a person with disabilities under the Rehabilitation Act, [2] who has been denied benefits of or excluded from participating in a federally funded program or special service, [3] solely because of his or her disability." Bryant, 692 F.3d at 216.

Plaintiffs cite to the same factual allegations in the Amended Complaint in support of their disability claim as they cite to support their FHA claim. (*See* Am. Compl. ¶¶ 1-10; 47-50.) Thus, Plaintiffs allege that they were

denied "their right to have guest [sic] visit without signing a log book at the receptionist desk," "not permitted to have the receptionist's electric door buzzed open," and assaulted, among other allegations. (*Id*. at ¶ 8.) They also generally allege that because of both their national origin and disability, Plaintiffs were denied "full and equal access to society, to the building premises, [and] to the exact lease terms." (Am. Compl. ¶ 49.) To the extent that Plaintiffs' Amended Complaint can be [*23] read to allege intentional discrimination or disparate impact, these claims arise out of the same facts as the FHA claims that are barred by the Settlement Agreement. (*See supra* Part II(b).) As discussed above in Part II(b), these factual claims are precluded by the Settlement Agreement, and, therefore, Plaintiffs' disability claim is also precluded by the Settlement Agreement.[8] Marvel Characters, 310 F.3d at 287 (holding that a claim is precluded when it arises from "the same transaction or connected series of transactions" at issue in the earlier litigation).

8  Even if this claim was not precluded by the Settlement Agreement, Plaintiffs have not alleged, nor can they allege -- viewing the facts in the light most favorable to Plaintiffs -- that they were directly discriminated against or suffered a disparate impact because of a disability. Plaintiffs submitted a letter from their physician that states they are disabled because of their anxiety disorders. (P1. Opp'n App. (part III) at 1-2.) Defendant Community Access is a not-for-profit organization "concentrating in the field of supportive housing and peer employment training programs for New Yorkers who live with a psychiatric disability." [*24] (Def. 56.1 ¶ 2; *see also* P1. Opp'n App. (part I) at 2.) Arguably, everyone in their rental complex is similarly situated in that they are all disabled. Plaintiff Nilda Cardona is also in a wheel chair. (Oral Arg. Tr. 7:5-7.) However, other than conclusory statements, there is no allegation that Plaintiff Nilda Cardona was treated differently than other tenants because of her inability to walk. *See* Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (alteration and citation omitted)); Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 512 (S.D.N.Y. 2010) (noting that a plaintiff must plead "[f]actual allegations [that] raise a right of relief above the speculative level[.]" (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))).

Plaintiffs allege for the first time in their opposition to the summary judgment that in August 2011, they began making requests for reasonable accommodation to

have a handicapped rail added to the shower for Plaintiff Nilda Cordona.[9] (Pl. Opp'n App. (part IV) at 1-2.) Defendant Johnson refused to install the bar. (*Id.*) Then on September [*25] 14, 2011, Plaintiff Nilda Cordona fell exiting the shower, injured herself and was hospitalized.[10] (*Id*) The Court need not consider a claim presented for the first time in an opposition to a summary judgment motion and will not do so here.[11] *See Avillan v. Donahoe, 483 F. App'x 637, 639 (2d Cir. 2012)* (summary order) ("The district court did not err in disregarding allegations [the plaintiff] raised for the first time in response to [the defendant's] summary judgment motion."); *Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701* (summary order) (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004))); *Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006)* (upholding the district court's denial of the plaintiff's request to amend the complaint in the summary judgment motion as the request was "untimely"); *Levion v. Societe Generale, 822 F. Supp. 2d 390, 394-99, n.4 (S.D.N.Y. 2011)* *aff'd, No. 11-CV-4476, 503 Fed. Appx. 62, 2012 U.S. App. LEXIS 23835, 2012 WL 5861809 (2d Cir. Nov. 20, 2012)* ("Indeed, '[b]ecause a failure to assert a claim until the last [*26] minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" (citations omitted)); *Evans v. Solomon, 681 F. Supp. 2d 233, 253 (E.D.N.Y. 2010)* ("[I]f a complaint does not fairly assert facts supporting a particular cause of action, 'it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.'" (citations omitted)). Defendants' motion for summary judgment is granted as to Plaintiffs' ADA and Rehabilitation Act claims.

---

9    Both the ADA and the FHA allow for reasonable accommodation claims. *Quad Enterprises Co., LLC v. Town of Southold, 369 F. App'x 202, 205 (2d Cir. 2010)* (summary order) ("Like the [FHA], the ADA requires entities to make reasonable accommodations for the disabled."); *Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003)* ("Both [FHA and ADA] require 'that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities.'" (citations [*27] omitted)). "To make out a claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that: (1) he suffers from a handicap

as defined by the [FHA]; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Bentley v. Peace and Quiet Realty 2 LLC, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005)*. Plaintiffs have the burden of showing that "but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Tsombanidis, 352 F.3d at 578*.

10    Plaintiffs clarified at oral argument that a bar was installed, but they felt that the bar was insufficient. (Oral Arg. Tr. 29:12-24.)

11    At oral argument, Plaintiff Nilda Cardona informed the Court that she previously hired an attorney and is currently pursuing her reasonable accommodation claim in a separate action. (Oral Arg. Tr. 34:8-34:21.) She stated that she considered her suit for reasonable accommodation to be wholly separate from her claim before this Court. (*Id.*)

### d. State [*28] Law Claims

#### i. Invasion of Privacy

Plaintiffs have not stated a claim for invasion of privacy. Plaintiffs allege that they were denied "their right to have guest [sic] visit without signing a log book at the receptionist desk," "not permitted to have the receptionist's electric door buzzed open," and assaulted, among other allegations. (*Id.* at ¶ 8.) New York State only recognizes the tort of invasion of privacy within the confines of Civil Rights Law §§ 50 and 51, which relate to the appropriation of a plaintiff's name or likeness for a defendant's benefit and when the plaintiff's name, portrait, or picture is used for advertising purposes or for trade without the plaintiff's consent.[12] *Matthews v. Malkus, 377 F. Supp. 2d 350, 359 (S.D.N.Y. 2005)* ("New York does not recognize a common-law right to privacy. A limited statutory right of privacy does exist, but only covers the use of one's 'name, portrait, picture, or voice . . . for advertising purposes or for the purposes of trade without the written consent first obtained.'" (citations omitted)); *Farrow v. Allstate Ins. Co., 53 A.D.3d 563, 862 N.Y.S.2d 92, 93 (App. Div. 2008)* ("New York State does not recognize the common-law tort of invasion of privacy [*29] except to the extent it comes within Civil Rights Law §§ 50 and 51. . . . These statutes protect against the appropriation of a plaintiff's name or likeness for a defendant's benefit and create a cause of action in favor of any person whose name, portrait, or picture is used for advertising purposes or for trade without the plaintiff's consent."); *Ram v. Moritt, 205*

A.D.2d 516, 612 N.Y.S.2d 671, 672-73 (App. Div. 1994) ("New York State does not recognize the common-law tort based upon invasion of privacy except to the extent it comes within Civil Rights Law §§ 50 and 51 . . . ."). Plaintiffs do not allege nor have they provided the Court with any facts to suggest that their name, voice, or likeness was used by either defendant for any type of advertising or trade purpose. Defendants' motion for summary judgment is granted as to this claim.

12    Plaintiffs also list the Privacy Act of 1974, 5 U.S.C. § 552a as a basis for one of their claims. (Am. Compl. ¶ 1.) This act is inapplicable. The Privacy Act sets limitations on when a record maintained by a federal government agency may be disclosed. See 5 U.S.C. § 552a; Nat 'l Aeronautics & Space Admin. v. Nelson, 562 U.S. ---, 131 S. Ct. 746, 753-54, 178 L. Ed. 2d 667 (2011) ("[T]he    [*30] Government may not disclose records pertaining to an individual without that individual's written consent [under § 552a(b)]."). The Privacy Act only applies to federal government agencies and not to state entities or private individuals. Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008) ("[T]he private right of civil action created by the Privacy Act is specifically limited to actions against agencies of the United States government."); Pennyfeather v. Tessler, 431 F.3d 54, 56 (2d Cir. 2005) ("[U]nder the Privacy Act . . . there is no private right of action against an official or employee of a municipal or state, rather than a federal, agency." (internal quotation marks and citations omitted)). Defendants are not federal government agencies. In addition, there is no allegation, nor has any evidence been presented, that any records were disclosed.

**ii. Intentional Infliction of Emotional Distress**

Plaintiffs bring a claim for intentional infliction of emotional distress against Defendants. In addition to citing to the same factual allegations in the Amended Complaint relied on to support their other claims, Plaintiffs generally allege "as a direct result and proximate [*31] cause of the acts or inactions by [Defendants] hereto, [Plaintiffs] have [suffered], and will continue to suffer great humiliation, mortification, and indignation, loss of normal activities (work/hobbies), exacerbation of preexisting medical/mental illnesses, day-and nightmare, compelled to pay large sums in medical expenses, forced to defend themselves against fabricated allegations/charges, all to the detriment to the plaintiffs."[13] (Am. Compl. ¶ 26) Plaintiffs have provided no evidence to support these claims.

13    While Plaintiffs use this same language to support all of their claims, it appears most appropriate for their intentional infliction of emotional distress claim. (See Am. Compl. ¶¶ 11, 16, 21, 31, 36, 41, 46, 50.)

To plead a claim for intentional infliction of emotional distress, a plaintiff must plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993); see also Gay v. Carlson, 60 F.3d 83, 89 (2d Cir. 1995) (outlining test for intentional infliction    [*32] of emotional distress). "New York courts have been 'very strict' in applying these elements." Gay, 60 F.3d at 89 (citing Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir. 1985)). "[T]he standard for stating a valid claim of intentional infliction of emotional distress is 'rigorous, and difficult to satisfy.'" Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (quoting Howell, 81 N.Y.2d at 122). Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and is of such a nature that it is "utterly intolerable in a civilized community." Marmelstein v. Kehillat New Hempstead, 11 N.Y.3d 15, 22-23, 892 N.E.2d 375, 862 N.Y.S.2d 311 (2008) (citation omitted); see also Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 564 (S.D.N.Y. 2012) (noting that "New York sets a particularly high bar" for intentional infliction of emotional distress cases requiring "conduct that is so 'extreme and outrageous'" (citations omitted)).

A claim for intentional infliction of emotional distress is subject to a one year statute of limitations. Bernstein v. Vill. of Piermont, No. 11-CV-3677, 2012 U.S. Dist. LEXIS 180392, 2012 WL 6625231, at *4 (S.D.N.Y. Dec. 20, 2012) ("[I]ntentional infliction of emotional    [*33] distress . . . [is] subject to a one year statute of limitations under N.Y. C.P.L.R. § 215(3).");  Wilson v. Erra, 94 A.D.3d 756, 942 N.Y.S.2d 127, 129 (App. Div. 2012) ("[I]ntentional infliction of emotional distress [is] governed by a one-year statute of limitations.").

In addition to re-alleging that Plaintiffs were treated differently than other tenants, Plaintiffs make several allegations of specific acts of assault purported to have occurred in September 2009, April 2010, and May 2010. (Compl. Ex. A.) Any claim for intentional infliction of emotion distress based on these alleged assaults is barred by the statute of limitations. See, e.g., Liang v. Cafe Spice SB, Inc., No. 09-CV-1306, 2012 U.S. Dist. LEXIS 170072, 2012 WL 5988766, at *21 n.26 (E.D.N.Y. Nov. 29, 2012) ("Though not raised by defendants, the Court notes that plaintiff's intentional infliction of emotional

distress claim is also barred by the one-year statute of limitations for such a claim."). Any claims related to Plaintiffs' general allegations that they were treated differently than other tenants because of their national origin and sexual orientation would be barred by res judicata because they arise from the same set of facts as the 2009 Litigation and [*34] the Settlement Agreement. (*See supra* Part II(b).)

Lastly, Plaintiffs general allegations that they have suffered "great humiliation, mortification, and indignation, loss of normal activities (work/hobbies), exacerbation of preexisting medical/mental illnesses, day-and nightmare" and that they have been "forced to defend themselves against fabricated allegations/charges, all to the detriment to the plaintiffs" (Am. Compl. ¶ 26) are not sufficiently outrageous to make out a claim for intentional infliction of emotional distress. *See, e.g., Stevens v. New York, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)* ("Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [intentional infliction of emotional distress] because the conduct alleged is not sufficiently outrageous." (quoting *Lydeatte v. Bronx Overall Econ. Dev. Corp., No. 00-CV-5433, 2001 U.S. Dist. LEXIS 1670, 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001)*)); *Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 270 (E.D.N.Y. 2009)* (holding that the plaintiff's claims that her requested accommodations were denied and she was subjected [*35] to retaliatory eviction proceedings were insufficient to sustain a claim of intentional infliction of emotional distress). Defendants' motion for summary judgment is granted as to Plaintiffs' claims for intentional infliction of emotional distress.

### iii. Discrimination

Plaintiffs bring a claim for discrimination under Civil Rights Law § 40-c. Plaintiffs cannot sustain a claim because they did not comply with the procedural requirements to bring a claim under Civil Rights Law § 40-c.

Civil Rights Law § 40-c states that "all persons within the jurisdiction of this state shall be entitled to the equal protection of the laws . . . [and] No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state." N.Y. Civ. Rights Law § 40-c. However, in order for § 40-c to apply, a plaintiff must [*36] satisfy the re-

quirements of Civil Rights Law § 40-d and provide the Attorney-General with notice at or before the commencement of the action. *Finch v. New York, No. 10-CV-9691, 2012 U.S. Dist. LEXIS 99453, 2012 WL 2866253, at *11 (S.D.N.Y. May 30, 2012)* ("The failure to serve the Attorney General at or before the commencement of an action under Section 40-c is fatal to the plaintiff's claim and requires dismissal of those causes of action."); *Cave v. E. Meadow Union Free Sch. Dist., 480 F. Supp. 2d 610, 642 (E.D.N.Y. 2007)* ("The failure to serve the Attorney General at or before the commencement of an action under Section 40-c is fatal to the plaintiffs' claim and requires dismissal of those causes of action."); *Sundaram v. Brookhaven Nat. Labs., 424 F. Supp. 2d 545, 571 (E.D.N.Y. 2006)* ("New York courts have consistently held that notice to the attorney general is an essential prerequisite to actions for violations of section 40-c."); *Chun Suk Bak v. Flynn Meyer Sunnyside, Inc., 285 A.D.2d 523, 727 N.Y.S.2d 656 (App. Div. 2001)* (affirming lower court's dismissal of the § 40-c claim because "[t]here is no allegation in the complaint that the plaintiff provided notice to the Attorney General at or before the commencement of the [*37] action as required by Civil Rights Law § 40-d"). Plaintiffs have not alleged nor have they provided any evidence suggesting that they served the Attorney General. Therefore, Defendants' motion for summary judgment is granted as to Plaintiffs' § 40-c discrimination claim.

### iv. Fraudulent Concealment

Plaintiffs bring a fraudulent concealment claim against Defendants. "To state a claim for fraudulent concealment, a plaintiff must allege: (1) that the defendant had a duty to disclose certain material information but failed to do so; (2) that the defendant then made a material misrepresentation of fact; (3) that said misrepresentation was made intentionally in order to defraud or mislead; (4) that the plaintiff reasonably relied on said misrepresentation; and (5) that the plaintiff suffered damage as a result." *Oxbow Calcining USA Inc. v. Am. Indus. Partners, 96 A.D.3d 646, 948 N.Y.S.2d 24, 30 (App. Div. 2012); see also High Tides, LLC v. DeMichele, 88 A.D.3d 954, 931 N.Y.S.2d 377, 380 (App. Div. 2011)* (outlining the elements of fraudulent concealment); *Milestone Shipping, S.A. v. Estech Trading LLC, 811 F. Supp. 2d 915, 925 (S.D.N.Y. 2011)* (same); *Zaccaro v. Shah, 746 F. Supp. 2d 508, 522 (S.D.N.Y. 2010)* (same). Plaintiffs [*38] allege no facts which would support a fraudulent concealment claim and Plaintiffs have failed to provide any evidence to support said claim. Defendants' motion for summary judgment is granted as to Plaintiffs' fraudulent concealment claim.

### v. Negligence

Plaintiffs also bring a negligence claim against Defendants. Plaintiffs' allegations are insufficient to support a negligence claim and Plaintiffs have not provided any evidence to support said claim.

"To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 499 N.Y.S.2d 392 (1985); see also *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) ("Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."); *Jiminez v. Shahid*, 83 A.D.3d 900, 922 N.Y.S.2d 123, 124 (App. Div. 2011) ("The elements of a common-law negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury [*39] proximately resulting there from."); *Wayburn v. Madison Land Ltd. P'ship*, 282 A.D.2d 301, 724 N.Y.S.2d 34, 37 (App. Div. 2001) ("To make out a prima facie case of negligence, a plaintiff must prove that the defendant owed a duty, breached that duty and that the breach proximately caused the plaintiff's injury."). "[A] plaintiff must demonstrate the existence of 'facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.'" *J.E. v. Beth Israel Hosp.*, 295 A.D.2d 281, 744 N.Y.S.2d 166, 169 (App. Div. 2002) (quoting *Schneider v. Kings Highway Hosp. Ctr., Inc.*, 67 N.Y.2d 743, 744, 490 N.E.2d 1221, 500 N.Y.S.2d 95 (1986)). Plaintiffs have alleged no facts nor have they provided the Court with any evidence of negligence or damages. Defendants' motion for summary judgment is granted as to Plaintiffs' negligence claim.

**vi. Assault and Battery**

Plaintiffs' assault and battery claims are barred by the statute of limitations. In New York, claims for the intentional torts of assault and battery are governed by a one year statute of limitations. N.Y. Civ. Prac. L. & R. § 215(3); *see also Ashjari v. Nynex Corp.*, 182 F.3d 898 (2d Cir. 1999) ("Under N.Y. C.P.L.R. § 215(3), claims of [*40] assault and battery . . . must be brought within one year from the date the claim accrued."); *Campbell v. City of New York*, No. 09-CV-3306, 2011 U.S. Dist. LEXIS 144352, 2011 WL 6329456, at *4 (E.D.N.Y. Dec. 15, 2011) ("New York law provides a one year statute of limitations."); *Sawyer v. Wight*, 196 F. Supp. 2d 220, 228 (E.D.N.Y. 2002) ("There is a one year statute of limitations for assault and battery claims in New York."). As an attachment to the first Complaint filed in this action, Plaintiffs included several letters which describe various

alleged assaults.[14] (Compl. Ex. A.) One letter alleges that Plaintiff Nilda Cardona was assaulted on September 19, 2009. (*Id.*) Another letter written to Judge Mann in June of 2010, asserted that Plaintiff Rufino Cardona had been assaulted in April of 2010. (*Id*) Another letter alleges that Plaintiff Rufino Cardona was assaulted in July of 2010. (*Id.*) The action was not brought until August of 2011, and thus, all of the alleged assault and batteries are outside of the statute of limitations. Defendants' motion for summary judgment is granted as to Plaintiffs' assault and battery claims.

> 14    Plaintiffs failed to include these letters as attachments in their Amended Complaint. [*41] Under a liberal reading of the Plaintiffs' Amended Complaint, the Court finds that the letters have been incorporated by reference in the Amended Complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (citations omitted)).

**vii. Conspiracy**

Plaintiffs bring a conspiracy claim against Defendants. "New York does not recognize an independent tort of conspiracy" and liability can only be available based on the establishment of "an independent underlying tort." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, No. 10-CV-3789, 887 F. Supp. 2d 459, 2012 U.S. Dist. LEXIS 114583, 2012 WL 3537009, at *17 (E.D.N.Y. Aug. 14, 2012) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006)); *see also Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 560 (E.D.N.Y. 2011) ("New York does not recognize an independent tort of civil conspiracy, such a cause of action is available only if there is evidence of an underlying actionable tort." (quoting *Baker v. R.T. Vanderbilt Co.*, 260 A.D.2d 750, 688 N.Y.S.2d 726, 729 (App. Div. 1999))); *In re Hoge*, 96 A.D.3d 1398, 946 N.Y.S.2d 350, 353 (App. Div. 2012) [*42] ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action." (citations omitted)). Since Plaintiffs have failed to sustain any underlying tort claims, they cannot sustain a claim for conspiracy. *See Nissan Motor Acceptance Corp. v. Scialpi*, 94 A.D.3d 1067, 944 N.Y.S.2d 160, 162 (App. Div. 2012) ("The respondents were entitled to summary judgment dismissing the causes of action to recover damages for conspiracy to commit fraud and conspiracy to commit a tortious act insofar as asserted against them, since a cause of action sounding in civil conspiracy cannot stand alone, but stands or falls with the underlying torts."). The Court grants Defend-

ants' summary judgment motion to dismiss the conspiracy claim.

### e. Plaintiffs' Motion for Sanctions

Plaintiffs allege that Defendants' summary judgment motion is "without merit" and demand financial sanctions. (Pl. Opp'n App. (part I) at 1.) "Rule 11(c) of the Federal Rules of Civil Procedure [ ] allows the court to sanction a party, if the court determines that the party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court." *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 517-18 (S.D.N.Y. 2012) [*43] (alteration in original) (quoting *Williamson v. Recovery Ltd. P 'ship*, 542 F.3d 43, 51 (2d Cir. 2008)). As Plaintiffs have failed to sustain any of their underlying claims, Defendants' summary judgment motion is not frivolous. Therefore, Plaintiffs' motion for sanctions is denied. *See e.g., Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir. 2004) (*per curiam*) (holding that the district court did not abuse its discretion in denying the plaintiff's request for sanctions against the defendant where the district court dismissed plaintiff's claims); *Stoner v. Young Concert Artists, Inc.*, No. 11-CV-7279, 2012 U.S. Dist. LEXIS 141892, 2012 WL 4471602, at *7-8 (S.D.N.Y. Sept. 26, 2012) (holding that sanctions were not warranted against the defendant where plaintiff's claims were dismissed).

### Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and dismisses the Amended Complaint in its entirety. The Court also denies Plaintiffs' motion for sanctions. The Clerk of the Court is directed to close the case.

SO ORDERED:

/s/ Judge Margo K. Brodie

MARGO K. BRODIE

United States District Judge

Dated: January 25, 2013

Brooklyn, New York

**Citation #2**
**2016 U.S. Dist. LEXIS 24064**



Positive
As of: Jun 15, 2016

JACKSON BRYANT BAUGUS, Plaintiff, vs. ARNIE BREY and MARY LOU BREY, Defendants.

CV 16-0013-M-DLC-JCL

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

2016 U.S. Dist. LEXIS 24064

January 26, 2016, Decided
January 26, 2016, Filed

**SUBSEQUENT HISTORY:** Adopted by Baugus v. Brey, 2016 U.S. Dist. LEXIS 23288 (D. Mont., Feb. 25, 2016)

**CORE TERMS:** prisoner, forma pauperis, civil action, filing fee, physical injury, incarcerated, imminent danger, liberally, forma

**COUNSEL:** [*1] Jackson Bryant Baugus, Plaintiff, Pro se, TEXARKANA, TX.

**JUDGES:** Jeremiah C. Lynch, United States Magistrate Judge.

**OPINION BY:** Jeremiah C. Lynch

**OPINION**

**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff Jackson Baugus, a federal prisoner proceeding without counsel, has filed a document entitled "Notice of Default" which has been liberally construed as a civil complaint. (Doc. 1.) In order to institute a civil action in federal court, a plaintiff must either pay a filing fee of $400.00 as required by 28 U.S.C. § 1914(a) or file a motion to proceed in forma pauperis under 28 U.S.C. § 1915. Although Baugus submitted a prisoner account statement from the facility where he is incarcerated, he has not paid the filing fee or filed a motion to proceed in forma paueris. Nevertheless, it would be futile to require

Baugus to submit a motion to proceed in forma pauperis because he is subject to the three strikes provision of 28 U.S.C. § 1915(g).

Permission to proceed in forma pauperis is discretionary with the Court. *See* 28 U.S.C. § 1915(a). 28 U.S.C. § 1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, [*2] brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Baugus has filed four civil actions which have been dismissed for failure to state a claim. *See Baugus v. Billings Police Department, et al.,* CV-10-00061-BLG-RFC, 2010 U.S. Dist. LEXIS 111643 (D. Mont. Judgment of dismissal filed October 19, 2010); *Baugus v. Haddon, et al.,* CV-12-00109-BLG-RFC, 2012 U.S. Dist. LEXIS 144154 (D. Mont. Judgment of dismissal filed October 4, 2012); and *Baugus v. Werner, et al.,* CV-15-00024-BLG-SPW, 2015 U.S. Dist. LEXIS

103965 (D. Mont. Judgment of dismissal filed August 7, 2015).

Baugus has exceeded the three "strikes" allowed by the Prison Litigation Reform Act to a prisoner attempting to proceed in forma pauperis in a federal civil lawsuit. As such, he cannot proceed in forma pauperis in the instant case unless he can show that he qualifies for the "imminent danger of serious physical injury" exception of 28 U.S.C. § 1915(g). Baugus is currently incarcerated at the Texarkana Federal Correctional Institution and has brought no claim against an employee of that institution. Thus, even when construed liberally [*3] in Baugus's favor, the allegations in the Complaint do not support a finding that Baugus is in "imminent danger of serious physical injury."

Baugus is not entitled to a fourteen-day period to object. *See Minetti v. Port of Seattle*, 152 F.3d 1113, 1114 (9th Cir. 1998) (per curiam). No motion for reconsideration will be entertained.

Based upon the foregoing, the Court issues the following:

**RECOMMENDATION**

Baugus should not be allowed to proceed in forma pauperis in this matter. The Clerk of Court should be directed close the case and enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure if Baugus fails to pay the filing fee within thirty days.

DATED this 26th day of January, 2016.

/s/ Jeremiah C. Lynch

Jeremiah C. Lynch

United States Magistrate Judge

**Citation #3**
**2005 U.S. Dist. LEXIS 11130**



Positive
As of: Jun 15, 2016

**HOSTCENTRIC TECHNOLOGIES, INC., Plaintiff, -against- REPUBLIC THUN-DERBOLT, LLC, Defendant.**

**04 Civ. 1621 (KMW) (AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 11130**

**June 9, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In proceedings before a magistrate judge, plaintiff sought to enforce a settlement agreement documented in an e-mail offer and acceptance, and also sought attorneys' fees against defendant.

**OVERVIEW:** Plaintiff asserted that the e-mailed offer and acceptance formed a valid and final settlement agreement and that the agreement was enforceable without an indemnification clause that the defendant attempted to add. In turn, the defendant argued that both sides impliedly reserved the right not to be bound by the e-mails. However, the magistrate judge found that the E-mail offer and acceptance formed a valid binding contract because the defendant acknowledged that it sent to the plaintiff a "final settlement counter-proposal" with an expiration date to accept the offer, and listed all of the essential terms of the settlement, which the plaintiff accepted within that time frame by e-mailing back to the defendant to "formally accept your settlement offer," and stating that the matter was "now conclusively settled." Further, the magistrate rejected the defendant's implied reservation argument on finding that the terms of the settlement were clear and thus the defendant's subjective intent was irrelevant, but denied the plaintiff's motion for attorneys' fees and costs because there was no evidence that the defendant had acted in bad faith in challenging the e-mailed settlement terms.

**OUTCOME:** The magistrate judge recommended that the plaintiff's motion to enforce the e-mailed settlement agreement should be granted, but the plaintiff's request for attorneys' fees should be denied.

**CORE TERMS:** settlement, email, settlement agreement, binding, attorneys' fees, lease, mutual, general releases, intend, binding contract, oral agreement, stipulation of settlement, fully executed, subjective intent, counter-proposal, indemnification, emailed, removal, settlement offers, final settlement, written document, written agreement, change of heart, reduced to writing, citation omitted, preliminary agreement, recommendation, memorializing, conclusively, reservation

**LexisNexis(R) Headnotes**

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN1]It is black letter law in the United States Court of Appeals for the Second Circuit that settlement agreements are contracts and must therefore be construed according to general principles of contract law. Specifically, under New York law, a settlement agreement is a contract subject to the ordinary rules of contract interpretation and enforcement.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN2]It is black letter law that in a diversity action state substantive law applies.

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > Validity*
*Contracts Law > Formation > Acceptance > General Overview*
[HN3]To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound. To this end, because a settlement agreement is a contract that is subject to the ordinary rules of contract construction and interpretation it requires an offer, an acceptance, and consideration to be enforceable, and will be construed in accordance with the intent of the parties.

*Civil Procedure > Settlements > Settlement Agreements > Modifications*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN4]Once reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN5]A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case pending before it.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN6]Parties' joint submission to the court that a settlement has been reached is a strong indication of their intent to be bound to the settlement.

*Civil Procedure > Settlements > Releases From Liability > General Releases*

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
[HN7]When interpreting the meaning of a contract, it is the objective intent of the parties that controls. The secret or subjective intent of the parties is irrelevant. To this end, settlement agreements and general releases are contracts construed according to general principles of contract law. Where a contract is unambiguous, a party's subjective intent is irrelevant. When the terms of a contract are clear, the secret or subjective intent of the parties is irrelevant.

*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN8]It is well established that parties are bound to the terms of a contract even though it is not signed or even written.

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > Validity*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN9]A "preliminary" agreement is binding, despite the desire for a later formal document, "when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form - only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. However, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. The intent to reduce a valid oral settlement agreement to writing does not prevent that oral agreement from being enforced. Specifically, under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document. Parties who intend to be bound by informal agreement are so bound even if they contemplate later memorializing their agreement in writing.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN10]To overcome the reasonable inference the parties to an oral agreement intend to be bound to that agreement courts draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, the moving party must do more than merely point to the circumstance that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that the nonmovant had reason to know that the movant contemplated that no obligations should arise until a formal contract was executed.

*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN11]In determining the parties' intent to be bound by an oral agreement, a court must look, not to their after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time.

*Contracts Law > Performance > Partial Performance > General Overview*
*Contracts Law > Types of Contracts > Oral Agreements*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN12]The United States Court of Appeals for the Second Circuit has articulated four factors to be considered in discerning whether the parties intended to be bound by a settlement agreement in the absence of a fully executed, written document: (1) whether there has been an express or implied reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. The Second Circuit has at various times stated that no single factor is decisive, but each provides significant guidance. But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important. Similarly, in cases involving binding preliminary agreements, the same importance should be placed on what the specific writing in question provides.

*Civil Procedure > Settlements > Releases From Liability > General Releases*
*Evidence > Judicial Notice > General Overview*

[HN13]Judges and lawyers know the customs and practices of the profession and need consult no expert to know the nature and intended effect of a standard form so common as a general release.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN14]A settlement is still binding even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time those terms are reduced to writing.

*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN15]The complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case*
[HN16]Under the law of the case doctrine, a court should not reopen issues decided in earlier stages of the same litigation.

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Contracts Law > Types of Contracts > Settlement Agreements*
[HN17]There is no general rule that attorneys' fees should be awarded on a successful motion to enforce a settlement agreement, but a court may award fees in such circumstances under the court's inherent power to award attorneys' fees to a successful litigant when the opposing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. In the absence of such behavior, fees are generally not awarded unless the settlement agreement expressly provides for a fee award.

**COUNSEL:** [*1] For Hostcentric Technologies, Inc., Plaintiff: Anthony L. Paccione, Kirschstein, Ottinger, Israel & Schiffmiller, P.C., New York, NY; Jonathan Jay Faust, Katten Muchin Zavis Rosenman, New York, NY; Leigh Stevens, Michael S. French, Wargo and French LLP, Atlanta, GA.

For Republic Thunderbolt, LLC, Counter Claimant: Anton J. Borovina, Borovina & Marullo PLLC, Melville, NY.

For Hostcentric Technologies, Inc., Counter Defendant: Anthony L. Paccione, Kirschstein, Ottinger, Israel & Schiffmiller, P.C., New York, NY; Jonathan Jay Faust, Katten Muchin Zavis Rosenman, New York, NY; Michael S. French, Wargo and French LLP, Atlanta, GA.

**JUDGES:** ANDREW J. PECK, United States Chief Magistrate Judge; Honorable Kimba M. Wood, United States District Judge.

**OPINION BY:** ANDREW J. PECK

**OPINION**

*REPORT AND RECOMMENDATION*

**ANDREW J. PECK, United States Chief Magistrate Judge:**

**To the Honorable Kimba M. Wood, United States District Judge:**

Presently before this Court is the motion by plaintiff Hostcentric Technologies, Inc. ("Hostcentric") to enforce a settlement agreement documented in an email offer and acceptance, and for attorneys' fees against defendant Republic Thunderbolt, [*2] LLC ("Republic").

For the reasons set forth below, Hostcentric's motion (Dkt. No. 21) to enforce the settlement should be GRANTED, but its request for attorneys' fees should be DENIED.

*FACTS*

The relevant facts are undisputed.

Hostcentric, as tenant, and Republic (at that time known as Warthog, Inc.), as landlord, entered into a ten year commercial lease agreement in January 2001. (Dkt. No. 23: Hostcentric Br. at 2; Dkt. No. 26: Republic Br. at 2; Dkt. No. 1: Compl. Ex. A: Lease.) On December 12, 2003, Hostcentric purported to terminate the lease agreement and it has not paid rent pursuant to the lease since December 1, 2003. (Hostcentric Br. at 2; Republic Br. at 2.)

Hostcentric filed suit in this Court against Republic seeking a declaratory judgement that Republic had acquiesced in the lease termination by accepting Hostcentric's surrender of the premises. (Compl.; *see* Hostcentric Br. at 2; Republic Br. at 2.) Republic counterclaimed for rent due to it from Hostcentric under the lease, and both parties engaged in discovery including depositions. (Dkt. No. 5: Answer & Counterclaim; *see* Hostcentric Br. at 2; Republic Br. at 3.)

In August 2004, the parties engaged [*3] in settlement negotiations. (Hostcentric Br. at 2; Republic Br. at 3.) According to Hostcentric, on September 15, 2004, the parties reached an oral settlement agreement in which Hostcentric agreed to pay $ 785,000 to Republic, less a credit to Hostcentric of $ 59,793 for the rent deposit held by Republic, and both parties would dismiss their respective claims with prejudice and execute full and mutual releases. (Hostcentric Br. at 2; *see* Dkt. No. 22: French Aff. P 3.) According to Hostcentric, Republic reneged on the oral settlement, claiming that the settlement required Hostcentric to pay $ 785,000 while allowing Republic to retain the $ 59,793 deposit. (Hostcentric Br. at 3; French Aff. P 4.)

*The September 21, 2004 Settlement Emails*

On September 21, 2004, Hostcentric requested a conference with Judge Wood to discuss enforcement of the oral agreement. (Dkt. No. 23: Hostcentric Br. at 3.) Later that day, Republic's counsel Anton Borovina called Hostcentric's counsel Michael French to propose new settlement terms. (Hostcentric Br. at 3; Dkt. No. 22: French Aff. P 6-7.) French replied that Hostcentric would not respond to any further settlement offers from Republic [*4] "unless they were binding offers made in writing." (Hostcentric Br. at 3; French Aff. P 7.) That evening at approximately 6:07 p.m., Borovina (Republic) sent French (Hostcentric) the following email:

> Michael,
>
> This is to confirm my client's *final settlement counter-proposal*:
>
> Fairchild will accept payment from your client in the amount of $ 755,000.00 with my client retaining the security deposit. The pending action would be dismissed with prejudice and all parties would exchange mutual general releases. The payment is due my client within 10 days from today's date.
>
> I must have your answer before the deposition of Robert Sanchez takes place tomorrow. *This counter-proposal expires by 9:30AM tomorrow unless accepted by you before that time.*
>
> Your client will be required to remove its property from the premises within 21 days and at its own expense.
>
> Anton

(French Aff. Ex. A, emphasis added; *see* French Aff. P 8; Hostcentric Br. at 3; Dkt. No. 26: Republic Br. at 3.) At

9:41 p.m., French (Hostcentric) emailed Borovina (Republic) to accept the offer, as follows:

> Anton,
>
> My client picked up my voicemail message and called me back. [*5]
>
> *I am writing to formally accept your settlement offer as set forth by you in your message from earlier this evening below.*
>
> *This matter is now conclusively settled.* Please let me know how you would like to communicate this fact to the Court.
>
> MSF

(French Aff. Ex. B, emphasis added; *see* French Aff. P 11; Hostcentric Br. at 4; Republic Br. at 3-4.) At 10:02 p.m., French (Hostcentric) sent Borovina (Republic) a follow-up email:

> Anton,
>
> *Now that the parties have agreed on a settlement, please let me know if you still want to draft the necessary papers.* If so, please send us a draft as soon as possible. We need to finalize these docs, including the dismissal papers and release, prior to the agreed date of payment.
>
> MSF

(Dkt. No. 28: Borovina Aff. Ex. A.)

The next morning, September 22, 2004, French (Hostcentric) sent Borovina (Republic) a letter by fax, attaching the above emails and again formally accepting Republic's offer, stating that "this matter is now settled and concluded." (French Aff. Ex. C; *see also* French Aff. P 11; Hostcentric Br. at 4.)

> On September 23, 2004, Borovina (Republic) sent a letter to Judge [*6] Wood stating: Counsel for all parties in the above referenced matter are *pleased to advise the court that this action has been settled.* The parties are preparing the appropriate paperwork which will include a stipulation of discontinuance with prejudice.

(French Aff. Ex. D; *accord*, Borovina Aff. Ex. B; *see* French Aff. P 12; Hostcentric Br. at 4-5; Republic Br. at 4.) Judge Wood dismissed the action but provided that the case could be reinstated to the docket within a speci-

fied time "if the settlement is not consummated." (Dkt. No. 16: 9/28/04 Order of Dismissal; *see also* Republic Br. at 5.)

### The Settlement Falls Apart

On September 27, 2004, Republic's counsel emailed to French (Hostcentric) a draft stipulation of settlement, containing the following provision:

> 9. Plaintiff hereby agrees to indemnify, defend and hold defendant harmless from and against all loss, costs or expense (including, without limitation, reasonable attorney's fees) arising from any claim for leasing commissions or finder's fees that may be asserted by A.J. Finkelstein Realty or any other broker relating to the sums stipulated herein and/or the re-letting or sub-leasing [*7] of the premises in question arising from any agreement between or understanding or claimed agreement or understanding between the plaintiff and such broker.

(Dkt. No. 22: French Aff. Ex. E; *accord*, Dkt. No. 28: Borovina Aff. Ex. C; *see also* French Aff. PP 13-14; Dkt. No. 23: Hostcentric Br. at 5; Dkt. No. 26: Republic Br. at 4-5.) This provision was never discussed by counsel for the parties nor was it part of the September 21 emails; Hostcentric advised Republic to remove the indemnification clause. (Hostcentric Br. at 5; French Aff. PP 14-17 & Ex. F.) Republic responded that it would not execute the stipulation without the indemnification clause or a release from the real estate broker. (Hostcentric Br. at 5; French Aff. P 18 & Ex. G.) Hostcentric considered this a breach of the September 21 email agreement and informed Republic that it would seek to enforce that agreement and seek attorneys' fees and costs. (Hostcentric Br. at 5-6; French Aff. P 19 & Ex. G.)

On October 7, 2004, Republic informed Judge Wood that "the contemplated settlement could not be consummated" and requested that the matter be restored to the Court's calendar. (Borovina Aff. Ex. E; Republic [*8] Br. at 5.) On January 6, 2005, Judge Wood "memo endorsed" Republic's letter as "granted." (Dkt. No. 18: 1/6/05 Memo Endorsed Order; *see* Borovina Aff. P 10 & Ex. J; Republic Br. at 6.) Hostcentric's formal motion to enforce the settlement followed.

### The Motion Before the Court

Hostcentric's current motion asserts that the emailed offer and acceptance formed a valid and final settlement agreement. Hostcentric argues that: (1) the words and deeds of both parties show that they entered into a full

and binding settlement [1] (Dkt. No. 23: Hostcentric Br. at 67 ); (2) the agreement is enforceable without the indemnification clause that Republic attempted to add (Hostcentric Br. at 9-10); and (3) Hostcentric is entitled to attorneys' fees (Hostcentric Br. at 11). In opposition, Republic asserts that Hostcentric's motion should be rejected because its arguments in support of the motion "were previously raised and then rejected by this court when it granted [Republic's] application" to restore the action to the Court's calendar. (Dkt. No. 25: Republic Br. at 6.) Republic further submits that it had no intention to be bound by an agreement "in the absence of a fully executed, [*9] written agreement" and that the "e-mails between counsel concerned the monetary accord and did not finally resolve the scope of the release and other issues." (Republic Br. at 7; see also Dkt. No. 27: Miller Aff. P 6-9.) Republic argues that both sides impliedly reserved the right not to be bound by the emails because: (1) the September 23, 2004 letter to Judge Wood and the September 21, 2004, 10:02 p.m. email from French to Borovina demonstrate that both parties were seeking to draft a written settlement finalizing all the terms of the contemplated settlement (Republic Br. at 7); (2) neither party attempted to perform any of the obligations under the purported settlement that could have evidenced an intention to be bound, including Hostcenetric's duty to pay Republic the $ 755,000 and remove its property from the leased premises (Republic Br. at 7); and (3) settlement agreements between landlords and tenants are a type of agreement that is usually put in writing (Republic Br. at 8).

1 Hostcentric points to several factors in this determination: (1) Republic sent Hostcentric a written settlement offer confirming Republic's "final settlement counter-proposal" (Hostcentric Br. at 6; see also page 3 above); (2) Republic's offer set out material terms of settlement including payment of funds, retention of the security deposit, dismissal of the action with prejudice, and an exchange of releases (Hostcentric Br. at 6; see also page 3 above); (3) Republic's offer included an acceptance deadline to which Hostcentric adhered both via e-mail and facsimile (Hostcentric Br. at 6; see also pages 3-4 above); and (4) Republic's counsel notified Judge Wood in writing that the action had been settled (Hostcentric Br. at 7; see also page 4 above).

[*10] *ANALYSIS*

**I. THE PURPORTED SETTLEMENT AGREEMENT MUST BE INTERPRETED UNDER PRINCIPLES OF CONTRACT LAW**

[HN1]It is black letter law in the Second Circuit that "settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999); accord, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 129 Fed. Appx. 676, 2005 U.S. App. LEXIS 8168, No. 04-3528, 2005 WL 1076552 at *1 (2d Cir. May 6, 2005); Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).* [2]

2 See, e.g., *Spanierman Gallery Profit Sharing Plan v. Merritt, 2004 U.S. Dist. LEXIS 15609, 00 Civ. 5712, 2004 WL 1781006 at *10 (S.D.N.Y. Aug. 10, 2004); Rella v. N. Atl. Marine, Ltd., 2004 U.S. Dist. LEXIS 11567, 02 Civ. 8573, 2004 WL 1418021 at *3 (S.D.N.Y. June 23, 2004)* ("Under New York law, a settlement agreement is a contract subject to the ordinary rules of contract interpretation and enforcement."); *Dahingo v. Royal Caribbean Cruises, Ltd., 312 F. Supp. 2d 440, 445 (S.D.N.Y. 2004); Manning v. Utils. Mut. Ins. Co., 2004 U.S. Dist. LEXIS 1674, 98 Civ. 4790, 2004 WL 235256 at *7 (S.D.N.Y. Feb. 9, 2004); Universal Outdoor, Inc. v. New Rochelle, 286 F. Supp. 2d 268, 274 (S.D.N.Y. 2003); Marisol A. v. Giuliani, 157 F. Supp. 2d 303, 306 (S.D.N.Y. 2001); Torres v. Costich, 935 F. Supp. 232, 234 (W.D.N.Y. 1996).*

[*11] In this case, the parties disagree as to whether a binding contract was formed by the September 21, 2004 emails between counsel for Hostcentric and Republic. This Court therefore must determine, under New York law, [3] whether a contract was formed, and if so, whether that contract is enforceable.

3 This Court has subject matter jurisdiction based on diversity of citizenship between the parties. (Dkt. No. 1: Compl. P 3.) [HN2]"'It is black letter law that in a diversity action such as this, state substantive law applies.'" *Chevron TCI, Inc. v. Talleyrand Assocs., LLC, 2003 U.S. Dist. LEXIS 22795, 03 Civ. 4043, 2003 WL 22977498 at *4 (S.D.N.Y. Dec. 19, 2003)* (Peck, M.J.) (quoting *Contri v. Yellow Freight Sys., 1996 U.S. Dist. LEXIS 2238, 92 Civ. 2603,1996 WL 87237 at *2 (S.D.N.Y. Feb. 29, 1996)* (Peck, M.J.) (citing *Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938))).* Here, the original lease provided that it was governed by New York law. (Dkt. No. 1: Compl. Ex. A: Lease § 10.4(A)). The parties' briefs cite federal cases from this Circuit and New York state cases. As the Second Circuit has stated, "the parties agree

that New York substantive law governs . . . and 'where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.'" *Texaco A/S (Denmark) v. Commercial Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) (quoting *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)); *accord, e.g.*, *Chevron TCI, Inc. v. Tallyrand Assocs., LLC*, 2003 U.S. Dist. LEXIS 22795, 2003 WL 22977498 at *4 & n.4 (citing cases); *Bellis v. Tokio Marine & Fire Ins. Co.*, 2002 U.S. Dist. LEXIS 1714, 93 Civ. 6549, 2002 WL 193149 at *13 n.20 (S.D.N.Y. Feb. 7, 2002).

[*12] [HN3]"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.'" *Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004); *see, e.g.*, *Wells Fargo Bank Minn. v. BrooksAmerica Mortg. Corp.*, 2004 U.S. Dist. LEXIS 18573, 02 Civ. 4467, 2004 WL 2072358 at *6 (S.D.N.Y. Sep. 14, 2004); *Facella v. Fed'n of Jewish Philanthropies of N.Y., Inc.*, 2004 U.S. Dist. LEXIS 14535, 98 Civ. 3146, 2004 WL 1700616 at *6 (S.D.N.Y. July 30, 2004); *Aderman v. Niagara Wheatfield Cent. Sch. Dist.*, 2003 U.S. Dist. LEXIS 9997, No. 01-CV-0801, 2003 WL 21382894 at *2 (W.D.N.Y. May 27, 2003); *Centre-Point Merchant Bank Ltd. v. American Express Bank Ltd.*, 2000 U.S. Dist. LEXIS 17296, 95 Civ. 5000, 2000 WL 1772874 at *3 (S.D.N.Y. Nov. 30, 2000); *Ostman v. St. John's Episcopal Hosp.*, 918 F. Supp. 635, 643 (E.D.N.Y. 1996) (Because a "settlement agreement is a contract that is subject to the ordinary rules of contract construction and interpretation. . . . it requires an offer, an acceptance, and consideration to be enforceable, and will be construed in accordance with the intent of the parties.").

[HN4]"Once reached, a settlement [*13] agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing." *Macdonald v. Dragone Classic Motor Cars*, 2003 U.S. Dist. LEXIS 14587, 95 Civ. 499, 2003 WL 22056626 at *6 (D. Conn. Apr. 29, 2003); *accord, e.g.*, *Omega Eng'g, Inc. v. Omega, SA*, 2004 U.S. Dist. LEXIS 27908, No. 98CV2464, 2004 WL 2191588 at *8 (D. Conn. Aug. 12, 2004).

"Moreover, [HN5]'[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case pending before it.'" *Macdonald v. Dragone Classic Motor Cars*, 2003 U.S. Dist. LEXIS 14587, 2003 WL 22056626 at *6 (quoting *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)); *accord, e.g.*, *Omega Eng'g. v. Omega,* *SA*, 2004 U.S. Dist. LEXIS 27908, 2004 WL 2191588 at *8.

## II. *THE EMAILED OFFER AND ACCEPTANCE BETWEEN HOSTCENTRIC AND REPUBLIC FORMED A VALID AND BINDING CONTRACT*

As discussed above, the formation of a contract requires, offer, acceptance, consideration, mutual assent and intent to [*14] be bound. (*See* page 8 above.) The September 21, 2004 emails met all of these factors. Republic, in its own words, sent to Hostcentric a "final settlement counter-proposal" with an expiration date to accept the offer, and listed all of the essential terms of the settlement: the settlement amount, removal of property from the premises, mutual general releases and dismissal of the lawsuit. (*See* page 3 above.) Hostcentric accepted the offer within that time frame, emailing back to Republic to "formally accept your settlement offer," and stating that the matter was "now conclusively settled." (*See* pages 3-4 above.) Republic then reported to Judge Wood that the matter was settled (*see* page 4 above), further evidence of Republic's intent to be bound. *See, e.g.*, *Citizens Bank & Trust Co. v. Se-Fish Assocs.*, 2003 U.S. Dist. LEXIS 18486, No. 99-CV-0417, 2003 WL 22383564 at *1, 4-5 (W.D.N.Y. Sept. 30, 2003) (Settlement enforced by the court where "the parties advised the Court that they had reached a settlement."); *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 294 (S.D.N.Y. 1995) [HN6](Parties' joint submission to the court that settlement was reached "is [*15] strong indication of their intent to be bound.").

Republic, however, argues that it did not intend to be bound by the emails. (*See, e.g.*, Dkt. No. 27: Miller Aff. PP 6-9; Dkt. No. 26: Republic Br. at 7.) The law is clear, however, that it is not a parties' subjective intent that controls, but rather what the parties said (and/or did). *See, e.g.*, *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) [HN7]("When interpreting the meaning of a contract, it is the objective intent of the parties that controls. The secret or subjective intent of the parties is irrelevant.") (citation omitted); *Brodeur v. City of New York*, 2005 U.S. Dist. LEXIS 10865, No. 04-CV-1859, 2005 WL 1139908 at *3 (E.D.N.Y. May 13, 2005) ("Settlement agreements and general releases are contracts construed according to general principles of contract law. . . . Where a contract is unambiguous, a party's subjective intent is irrelevant."); *Cusano v. Horipro Entm't Group*, 301 F. Supp. 2d 272, 277 (S.D.N.Y.2004) ("When the terms of a contract are clear, 'the secret or subjective intent of the parties is irrelevant.'") (quoting *Klos v. Lotnicze*, 133 F.3d at 168), [*16] *aff'd*, No. 04-0575, 126 Fed. Appx. 521, 2005 WL 927425 (2d Cir. Apr. 22, 2005).

Here, Republic's counsel made a final offer in writing to Hostcentric that stated (or at least objectively appeared to state) all material terms, and Hostcentric accepted the offer. (*See* pages 3-4 above.) Republic's (alleged) undisclosed intent is irrelevant.

Without citing to any case law, Republic further argues that the fact that both parties wanted a formal executed stipulation of settlement implies that they did not intend to be bound by the emailed agreement. (Dkt. No. 26: Republic Br. at 7.) The Court disagrees. [HN8]"It is well established that parties are bound to the terms of a contract even though it is not signed [or even written]." *Omega Eng'g, Inc. v. Omega, S.A.*, 2004 U.S. Dist. LEXIS 27908, 98 Civ. 2464, 2004 WL 2191588 at *7 (D. Conn. Aug. 12, 2004) (bracketed material in original). Republic argues that "it did not intend to be bound by any agreement in the absence of a fully executed, written agreement," but that this "reservation" was not "explicit," but should be "implied" from the fact that the parties intended to draft formal settlement papers. (Republic Br. at 7.) The [*17] problem with Republic's argument is its failure to distinguish between a preliminary agreement contingent on and not intended to be binding absent formal documentation, and a binding agreement that is nevertheless to be further documented. The emails demonstrate the latter type agreement, which is binding.

As then-District (now Circuit) Judge Leval stated almost twenty years ago (and the Second Circuit later adopted), [HN9]a "preliminary" agreement is binding, despite the desire for a later formal document, "when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form - only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable." *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987); [4] *accord*, *e.g.*, *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 293 (S.D.N.Y. 1995) (quoting Judge Leval's *Teachers* decision); *Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1176-77 (S.D.N.Y. 1994) [*18] (same). As the Second Circuit explained over thirty-five years ago: "Two rules on this subject are well established: First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S. Ct. 1197, 22 L. Ed. 2d 454 (1969); *see also*, *e.g.*, *Francis v. HBO*, 2005

U.S. Dist. LEXIS 7723, 04 Civ. 7430, 2005 WL 1020863 at *4 (S.D.N.Y. Apr. 28, 2005)("The intent to reduce a valid oral settlement agreement to writing, however, does not prevent that oral agreement from being enforced."); *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Communications, Inc.*, 1994 U.S. Dist. LEXIS 11896, 92 Civ. 7862, 1994 WL 463014 at *3 (S.D.N.Y. Aug. 24, 1994) (Wood, D.J.) ("Under New York law, 'parties are free to enter into a binding contract without memorializing their agreement in a fully executed [*19] document.' . . . Parties who intend to be bound by informal agreement are so bound even if they contemplate later memorializing their agreement in writing.") (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir.1986); *Villeroy & Boch S.A.R.L. v. THC Sys.*, 1991 U.S. Dist. LEXIS 7352, 84 Civ. 8073, 1991 WL 102520 at *4 (S.D.N.Y. June 3, 1991) ("An informal agreement may be binding despite the parties' contemplation to memorialize the contract into a written document. It requires proof that the parties did not intend to form an agreement whereby the validity thereof depended on formal execution of a written document . . . ").

4    The Second Circuit adopted Judge Leval's framework in *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71-72 (2d Cir. 1989); *accord*, *e.g.*, *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547-48 (2d Cir. 1998) ("A framework under New York law for analyzing the issue of whether a preliminary agreement is a binding contract or an unenforceable agreement to agree was articulated by Judge Leval in *Teachers* . . . and applied by this Court in *Arcadian*. . . .") (fn. omitted).

[*20] Republic's argument that it is implicit that both parties intended not to be bound until the formal settlement agreement was signed is based solely on the fact that formal documentation was contemplated. (Republic Br. at 7.) The Second Circuit has held, however, that more is needed:

[HN10]To overcome the reasonable inference we draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, appellees must do more than merely point to the circumstance that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that [appellant] had reason to know that [appellee] contemplated that no obligations should arise until a formal contract was executed. But appellees have referred to no evidence

substantiating either of these possibilities, and we do not find them supported by our independent review of the evidence.

*V'Soske v. Barwick*, 404 F.2d at 499.

The test is not Republic's after-the-fact professed intent, but the parties' intent as expressed in their words and deeds at the time. As Judge Wood has explained:

> [HN11]In [*21] determining the parties' intent, a court must look, not to their "after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time."

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V v. AT&T Communications, Inc.*, 1994 U.S. Dist. LEXIS 11896, 1994 WL 463014 at *3; *accord, e.g., Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d at 549 ("Subjective evidence of intent . . . is generally not considered."); *see also* cases cited at pages 12 above.

To determine whether the parties intended to be bound in the absence of a fully executed formal written agreement, Republic cites to the four factors test articulated by the Second Circuit in *Winston v. Mediafare Entm't Corp.*, 777 F.2d at 80. (Republic Br. at 6.) As Judge Wood restated the *Winston* factors: [HN12]"The Second Circuit Court of Appeals has articulated four factors to be considered in discerning whether the parties intended to be bound [by a settlement agreement] in the absence of a fully executed, written document: (1) whether there has been an express or implied reservation of the right not to be bound [*22] in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V v. AT&T Communications, Inc.*, 1994 U.S. Dist. LEXIS 11896, 1994 WL 463014 at *3 (citing *Winston v. Mediafare Entm't Corp.*, 777 F.2d at 80); *accord, e.g., RKG Holdings, Inc. v. Simon*, No. 98-9433, 182 F.3d 901 (table), [published in full-text format at 1999 U.S. App. LEXIS 13969], 1999 WL 464979 at *1 (2d Cir. June 23, 1999); *Adjustrite Sys. v. GAB Bus. Servs., Inc.*, 145 F.3d at 549; *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d at 72; *Melwani v. Jain*, 2004 U.S. Dist. LEXIS 7590, 02 Civ. 1224, 2004 WL 936814 at *4 (S.D.N.Y. Apr. 29, 2004); *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp.

2d 241, 248 (E.D.N.Y. 2002); *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. at 293.[5]

The first factor, the parties' objectively-expressed intent, is the most important:

> The Second Circuit has at various [*23] times stated that 'no single factor is decisive, but each provides significant guidance.' But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important. Similarly, in cases involving binding preliminary agreements, the same importance should be placed on what the specific writing in question provides.

*Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. at 293 (citations omitted); *accord, e.g., Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d at 549 ("The first factor, the language of the agreement, is 'the most important.'"); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d at 72 ("The first factor, the language of the agreement, is the most important."); *RKG Holdings, Inc. v. Simon*, 182 F.3d 901, [published in full-text format at 1999 U.S. App. LEXIS 13969], 1999 WL 464979 at *1 ("To determine if an oral agreement becomes legally binding, the intent of the parties is of central importance.'"); *Horphag Research Ltd. v. Henkel Corp.*, 115 F. Supp. 2d 455, 457 (S.D.N.Y. 2000); *Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1177 (S.D.N.Y. 1994). [*24]

> 5 Hostcentric argues that the *Winston* analysis is inappropriate in this case because the settlement agreement in question was, in fact, a written document (two emails), while "in *Winston*, the court established a test to determine whether an oral contract is binding without memorializing the agreement in a fully-executed document. . . . *Winston* and its progeny do not apply here because Republic and Hostcentric entered into a written settlement agreement." (Dkt. No. 25: Hostcentric Reply Br. at 3.) However, the *Winston* analysis has been utilized in this Circuit when an agreement is written but not executed into a formal document by both parties. *See, e.g., Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 323 (2d Cir. 1997) (Using *Winston* factors to determine that "district court erred in concluding that the parties intended the unexecuted draft settlement constitute a binding agreement"); *Winn v. Seaport Manor Corp.*, 2002 U.S. Dist. LEXIS 16779, 01 Civ. 5349, 2002 WL 31133388 at *2 (S.D.N.Y. Aug. 22, 2002) (using *Winston*

factors to determine that unsigned draft of a stipulation of settlement constituted a binding agreement).

[*25] The first - and most important - *Winston* factor clearly favors Hostcentric. The two emails constitute a classic offer and acceptance, contain all the terms of the agreement, and evidence the intent that the "matter [was] now conclusively settled." (*See* page 4 above.) Indeed, after Hostcentric's acceptance email that stated the matter was "conclusively settled," Hostcentric sent a follow-up email, confirming the finality of the settlement and asking whether Republic still wanted to draft formal papers: "Now that the parties have agreed on a settlement, please let me know if you still want to draft the necessary papers." (Dkt. No. 28: Borovina Aff. Ex. A, quoted at page 4 above.) Republic did not respond directly to Hostcentric, but wrote to Judge Wood that the parties "are pleased to advise the court that this action has been settled," although also noting that the parties were preparing paperwork. (Borovina Aff. Ex. B, quoted at page 4 above.) Thus, both parties referred to there being a conclusive settlement. *Compare*, *e.g.*, *Winston v. Mediafare Entm't Corp.*, 777 F.2d at 81 (party's letters to opposing counsel and court referred to the "proposed [*26] agreement" and "proposed settlement"); *Rella v. N. Atl. Marine, Ltd.*, 2004 U.S. Dist. LEXIS 11567, 2004 WL 1418021 at *3 (party's letter that it was "enclosing a *proposed* stipulation of settlement for [opposing parties'] review and approval" showed intent not to be bound absent signed agreement) (emphasis in original); *Cedric Kushner Promotions, Ltd. v. King*, 1999 U.S. Dist. LEXIS 90, 98 Civ. 6859, 1999 WL 13732 at *2 (S.D.N.Y. Jan 11, 1999) ("Each draft of the proposed stipulation contained a provision imposing a duty on DKP to pay $ 100,000 'upon execution of this Stipulation by the undersigned counsel.' . . . In addition, the cover sheet accompanying the December 4, 1998 instrument at issue refers to that instrument as the 'revised draft stipulation.' This Court interprets the use of the terms 'execution' and 'draft' as evidence that the parties did not intend to be bound in the absence of a signed writing."); *and Clorox Int'l Co. v. International Trade Expo, Inc.*, 1995 U.S. Dist. LEXIS 2871, 94 Civ. 0938, 1995 WL 106104 at *6 (S.D.N.Y. Mar. 9, 1995) ("Correspondence by [plaintiff's counsel] to the court referred to a 'potential' or 'proposed' settlement . . .; counsel for the ITE defendants [*27] did not, at the time, object to this characterization of the settlement. Had the parties intended to be bound by the terms of an agreement reached on August 23, none of these subsequent actions could be explained."); *with*, *e.g.*, *Omega Eng'g, Inc. v. Omega, SA*, 2004 U.S. Dist. LEXIS 27908, No. 98CV2464, 2004 WL 2191588 at *1, 11 (D. Conn. Aug. 12, 2004) (Settlement agreement enforced where, *inter alia*, "the parties reported to the court that [the] matter had been settled."); *Melwani v.*

*Jain*, 2004 U.S. Dist. LEXIS 7590, 2004 WL 936814 at *5 ("No party to the settlement expressed any reservation on the record of a right not to be bound absent an executed agreement. . . ."); *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. at 294 (first factor favors finding agreement binding where "in the press releases, the Form 10-Q filed by the Company with the SEC, and the joint motion to this Court, EXTL represented that it had entered into a settlement agreement with the plaintiffs. . . . In this case, the actions of the parties, particularly in their joint submission to this Court, is strong indication of their intent to be bound. . . . The first factor favors plaintiff in this [*28] case."); *and Vari-O-Matic Mach. Corp. v. New York Sewing Mach. Attachment Corp.*, 629 F. Supp. 257, 258-59 (S.D.N.Y. 1986) ("In this case the court issued two orders . . . upon the representation of the parties that settlement had been reached and that a stipulation of settlement would be filed forthwith. Failure to complete the formal stipulation papers does not mean that a settlement was not in fact reached. . . . In this case since both parties made representations to the court that agreement had been reached, there can be no factual dispute that a settlement has been consummated.").

The second *Winston* factor, partial performance, is essentially neutral. Since Republic repudiated the agreement before the time for Hostcentric's payment or removal of its property from the premises, it is not surprising that Hostcentric did not thereafter perform.

The third *Winston* factor, whether all of the terms had been agreed on, favors Hostcentric. The email exchange agreed on payment amount and timing, removal of Hostcentric's property from the premises and a time for that performance, mutual general releases and dismissal of the lawsuit with prejudice. (*See* [*29] pages 3-4 above.)

Republic asserts that while the "emails between counsel concerned the monetary accord," the "did not finally resolve the scope of the release and other issues." (Republic Br. at 7.) To the contrary, the emails referred to "mutual general releases," a concept well known to lawyers and usually contained in a standard Blumberg form. *Cf.*, *Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n*, 376 F.3d 102, 109 (2d Cir. 1994) [HN13]("Judges and lawyers know the customs and practices of the profession and need consult no expert to know the nature and intended effect of a standard form so common as a general release."); *Melwani v. Jain*, 2004 U.S. Dist. LEXIS 7590, 2004 WL 936814 at *5 ("Even if Melwani planned to execute a written general release subsequent to stating his agreement on the record, that would not satisfy the express reservation of rights requirement."). Indeed, Republic's proposed formal "Stipulation of Settlement" states that the parties "shall exchange mutual general releases," the same language as in the emails.

(*See* Dkt. No. 22: French Aff. Ex. E: Republic "Stipulation of Settlement" P 8.) Republic does not state what "other issues" remained. [*30] Indeed, the only "other issue" reflected in Republic's draft "Stipulation of Settlement" was the indemnification for lease commissions paragraph (P 9, quoted at page 5 above). Had Republic wished such indemnification, it should have included that term in its "final settlement counter-proposal" email, but it did not. The addition of this new term does not tip the third factor to Republic. Rather, the third factor would favor the party who claims not to be bound when (1) key terms, such as price, have not been agreed upon, or (2) both parties make changes during the drafting process. *Compare, e.g., Winston v. Mediafare Entm't Corp., 777 F.2d at 82-83* ("Where, as here, counsel insist on continually redrafting specific terms of a proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution and consummation of the agreement."); *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V v. AT&T Communications, Inc., 1994 U.S. Dist. LEXIS 11896, 1994 WL 463014 at *4* (same); *with, e.g., Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d at 251* (when parties had agreed on these terms, but [*31] remained apart only on amount to be paid in settlement, and subsequently agreed to Court's recommendation as to that amount, no additional terms remained to be negotiated, and third factor favored enforcement of agreement; "once a party agrees to the settlement terms, either orally or in writing, that party's later change of heart will not frustrate the agreement's enforceability."); *see also, e.g., Brown v. Nationscredit Commer. Corp., 2000 U.S. Dist. LEXIS 9153, No. 99-CV-592, 2000 WL 888507 at *2 (D. Conn. June 23, 2000)* [HN14](A "settlement is still binding even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time those terms are reduced to writing."); *Foster v. City of New York, 2000 U.S. Dist. LEXIS 1251, 96 Civ. 9271, 2000 WL 145927 at *4 (S.D.N.Y. Feb. 7, 2000)* ("This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."); *Willgerodt ex rel. Majority Peoples' Fund for the 21st Century, Inc. v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y.1997)* ("Afterthought or change of mind are not sufficient to justify rejecting a settlement."), *aff'd, 159 F.3d 1347 (2d Cir. 1998).* [*32]

Finally, the fourth *Winston* factor is whether the agreement is the type of contract that is usually committed to writing. (*See* page 14 above.) Republic argues that this agreement is one usually committed to writing because "the court in *Winston* held that even a simple settlement agreement is one that is usually put in writing." (Republic Br. at 8.) In fact, the Second Circuit in *Winston* was referring to a settlement agreement that called for "payment . . . over several years based on a percent-

age of earnings." *Winston v. Mediafare Entm't Corp., 777 F.2d at 83.* Since the *Winston* test is designed to determine if a settlement agreement is binding absent a formally executed agreement, it would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written. Republic has misinterpreted Winston's decision as to the fourth factor.

Rather, the correct question is whether the settlement agreement terms are sufficiently complex or involve long time periods, such that there should be a formal writing. *See, e.g., Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d at 551* [*33] ("In view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts."); *Ciaramella v. Reader's Digest Ass'n, 131 F.3d at 326* ("We have also found that [HN15]the complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally."); *Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d at 251* ("The court in *Winston* also assessed the complexity of the underlying agreement - *i.e.,* whether it is the type of agreement that generally requires a written contract - by examining the following factors: (1) the amount of money at issue, (2) whether the terms of agreement will carry into perpetuity, and (3) the length and complexity of the agreement itself."); *Cedric Kushner Promotions, Ltd. v. King, 1999 U.S. Dist. LEXIS 90, 1999 WL 13732 at *2* ("The final factor is whether [*34] the agreement at issue is the type of instrument that is usually committed to a writing. For these purposes, courts have considered both the amount of money at stake as well as the magnitude and complexity of the deal.").

Moreover, in this case there was a writing - Republic's email (and Hostcentric's email accepting Republic's proposal without change. (*See* page 4 above.) Those emails memorialized all the terms - payment amount and schedule, removal of property and deadline, mutual general releases, and dismissal of the lawsuit. (*See* page 4 above.) Republic's proposed formal "Stipulation of Settlement" is only three pages long (one page of which contains only the caption and some "Whereas" clauses), and the eight agreed-upon substantive paragraphs on pages 2 and 3 are short, simple and no different than the email terms. (*Compare* French Aff. Ex. A email *with* French Aff. Ex. E "Stipulation of Settlement.") While the Court can take judicial notice that a commercial lease usually is a lengthy document (*see, e.g.,* Dkt. No. 1:

Compl. Ex. A: Lease), Republic presents no evidence that a simple lease termination is complex or the type of agreement that usually is set [*35] forth in a formal written agreement. On termination of a lease, the terms that need to be addressed are the tenant's time to depart the premises and/or remove property, what must be paid to the landlord, and condition of the premises. All of those terms were covered in the emails. The emails also covered the items typical of a settlement - the type of release (mutual and general) [6] and dismissal of the action (with prejudice). Finally, the agreement would last only the short time necessary for payment and removal of property, not for a lengthy time into the future.

> 6  Republic again argues that the release was not agreed upon (Republic Br. at 8, citing Miller Aff.), but as discussed above, the email referred to "mutual general releases," a clearly understood reference among lawyers, and even Republic's draft formal agreement referred to mutual general releases. (*See* page 18 above.)

Finally, the Court notes that even if one were to find that this type of agreement should be in writing, it was - the parties [*36] were not dealing with an oral agreement but one written in an email from Republic and accepted by an email from Hostcentric. *See, e.g., Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d at 251-52 ("Here, even if the agreement is the type that is typically reduced to writing, the written draft of the settlement had essentially been finalized. . . . The terms, with the exception of the final dollar amounts, were 'substantially complete' and 'largely reduced to writing.' Moreover, the parties had confirmed to the court, as part of the process of negotiating the monetary amount, that their agreement on a sum would settle the case.") (citations omitted); *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. at 295 ("The fourth factor is not particularly meaningful in this context, the agreements are in writing.").

In short, based on review of all of the *Winston* factors, the Court finds that the parties intended for the two emails to constitute a binding contract, and that the settlement agreement therefore should be enforced by the Court. [7]

> 7  Republic's argument that "the law of the case" warrants denial of Hostcentric's motion is entirely misplaced. (Republic Br. at 6.) Republic appears to claim that Judge Wood's restoration of this action to the docket means that Hostcentric's arguments in support of its motion to enforce were rejected by the Court. [HN16]"Under the 'law of the case' doctrine, 'a court should not reopen issues decided in earlier stages of the same litigation.'" *National Enters. v. New York Tax Comm'n*, No. 99-7841, 208 F.3d 203 (table), 2000 WL 305510 at *1 (2d Cir. Mar. 22, 2000) (quoting *Agostini v. Felton*, 521 U.S. 203, 236, 117 S. Ct. 1997, 2017, 138 L. Ed. 2d 391 (1997)). Judge Wood did not decide whether the parties had or had not reached a binding settlement. Republic asked that the case be returned to the docket, and Judge Wood endorsed that request as "granted." (*See* page 6 above.) The case needed to be returned to the Court's docket in either case - either to continue the litigation if Republic was correct or to allow Hostcentric to move to enforce the settlement that Republic repudiated. The order restoring the case to the docket did not decide that question - if it had, there would have been no need for Judge Wood to refer Hostcentric's motion to enforce the settlement to me for a Report and Recommendation, when she could have endorsed it as "denied under the law of the case." Republic's law of the case argument is frivolous.

[*37]  **III. *HOSTCENTRIC'S APPLICATION FOR ATTORNEYS' FEES SHOULD BE DENIED***

Hostcentric seeks an award of its "attorneys' fees and other costs incurred as a result of Republic's breach of the Written Settlement Agreement." (Dkt. N. 23: Hostcentric Br. at 11.) Hostcentric neither states the amount in issue, nor cites to any case law awarding attorneys' fees in such a case. (*Id.*) In fact, most of the cases in this Circuit have declined to award attorneys' fees in this situation. *See e.g., Francis v. HBO*, 2005 U.S. Dist. LEXIS 7723, 04 Civ. 7430, 2005 WL 1020863 at *4 (S.D.N.Y. Apr. 28, 2005); *Omega Eng'g, Inc. v. Omega, S.A.*, 2004 U.S. Dist. LEXIS 27908, 98 Civ. 2464, 2004 WL 2191588 at *11 (D. Conn. Aug. 12, 2004); *Edelman v. Smith Barney, Inc.*, 2000 U.S. Dist. LEXIS 85, 98 Civ. 691, 2000 WL 10209 at *6 (S.D.N.Y. Jan. 6, 2000); *Torres v. Costich*, 935 F. Supp. 232, 236 (W.D.N.Y. 1996) [HN17]("There is no general rule that attorney's fees should be awarded on a successful motion to enforce a settlement agreement, but a court may award fees in such circumstances under the court's inherent power to award attorney's fees to a successful litigant when the opposing party [*38] has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' In the absence of such behavior, fees are generally not awarded unless the settlement agreement expressly provides for a fee award.") (citations omitted); *Apple Corps v. Sony Music Entm't, Inc.*, 1993 U.S. Dist. LEXIS 9512, 91 Civ. 7465, 1993 WL 267362 at *9-10 (S.D.N.Y. July 14, 1993). While the Court is sympathetic to Hostcentric, there is no basis to award it attorneys' fees. Accordingly, the Court should deny Hostcentric's request for attorneys' fees.

*CONCLUSION*

For the reasons set forth above, Hostcentric's motion (Dkt. N. 21) to enforce the settlement should be GRANTED, but its application for attorneys' fees should be DENIED.

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, [*39] with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993), *cert. denied*, 513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); , *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992), *cert. denied* 506 U.S. 1038, 121 L. Ed. 2d 696, 113 S. Ct. 825 (1992); *Small v. Sec'y of HHS*, 892 F.2d 15, 16 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57-59 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a) [*40] , 6(e).

DATED: New York, New York

June 9, 2005

Respectfully submitted,

**Andrew J. Peck**

United States Chief Magistrate Judge

**Citation #4**
**2014 U.S. Dist. LEXIS 70100**



Positive
As of: Jun 15, 2016

**LEILA MAPEL, Plaintiff, - against - REGIS CORPORATION d/b/a JEAN LOUIS DAVID, Defendant.**

**12 Civ. 6863 (RA) (JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2014 U.S. Dist. LEXIS 70100**

**January 28, 2014, Decided**
**January 28, 2014, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Motion granted by Mapel v. Regis Corp., 2014 U.S. Dist. LEXIS 69182 (S.D.N.Y., May 19, 2014)

**CORE TERMS:** settlement agreement, settlement, mediation, settlement amount, reservation, binding, oral agreements, partial performance, weigh, memorializing, negotiation, enforceable, recommend, long-term, reserved, pro bono, parties agreed, emotional distress, lost wages, declaration, attributed, mutual

**COUNSEL:** [*1] Leila Mapel, Plaintiff, Pro se, Woodhaven, NY.

For Regis Corporation, doing business as Jean Louis David, Defendant: Caitlin Senff Ladd, Stephanie Lauren Aranyos, Ogletree, Deakins P.C., New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE. HONORABLE RONNIE ABRAMS, U.S.D.J.

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

REPORT AND RECOMMENDATION

TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:

Defendant Regis Corporation ("Regis") asks the Court to enforce a settlement agreement allegedly en-

tered into during a court-ordered mediation session on May 23, 2013. I recommend granting the motion.

Background[1]

> 1    These facts are drawn from the record in this case and from the declaration of Caitlin S. Ladd, Esq., who was counsel for the defendant at the time of the mediation (Declaration of Caitlin S. Ladd, Esq., dated Oct. 24, 2013 ("Ladd Decl."), ¶¶ 1, 3). The plaintiff has not submitted any substantive response to this motion. Instead, Ms. Mapel submitted a copy of an order from the Hon. Ronnie Abrams, U.S.D.J., requiring Ms. Mapel to file her opposition to the defendant's motion "no later than December 31, 2013 or the Court will consider the motion fully briefed and will decide the motion." (Order signed by Plaintiff [*2] filed on Dec. 30, 2013, at 1 (docketed as Letter)). The plaintiff simply added her own signature to this order and returned it to the Court. Ms. Mapel has therefore foregone her opportunity to dispute facts or present opposing legal argument.

Pro se plaintiff Leila Mapel filed a complaint against her employer, Regis, alleging that she was discriminated against on the basis of her race in violation of federal and state law. (Complaint, ¶ 40). The case was referred for mediation to the Court's Alternative Dispute Resolution Program, and Ms. Mapel was assigned pro bono counsel from Seton Hall Law School's Conflict Management

Program for the limited purpose of representing her during the mediation. (Order dated March 22, 2013; Notice of Limited Appearance of Pro Bono Counsel dated April 27, 2013).

Accompanied by their respective counsel, the plaintiff and a representative of Regis attended the mediation. (Ladd Decl., ¶ 3). After several hours of negotiation, the parties agreed that Ms. Mapel would dismiss this action in exchange for $13,000. (Ladd Decl., ¶ 4). They further agreed on a mutual release, the timing of payment of the settlement amount, the allocation of that amount (as between [*3] the portion attributed to emotional distress and the portion attributed to lost wages), a "no rehire" provision, and a "neutral reference" provision. (Ladd Decl., ¶ 5-6). Ms. Mapel and defendant's attorney then signed a document stating that, following mediation, the parties had reached a settlement agreement and would file appropriate papers. (Ladd Decl, ¶ 8 & Exh. A ("Acknowledgment of Settlement").

Approximately one week later, one of the law students who assisted in representing Ms. Mapel at the mediation telephoned defendant's counsel to say that the plaintiff had revoked the agreement; she followed up with an e-mail "confirm[ing] [] Ms. Leila Mapel's revocation of the settlement agreement." (Ladd Decl., ¶¶ 10-11 & Exh. B).

Discussion

It is well-settled that "[p]arties can enter into binding oral agreements." Figueroa v. City of New York, No. 05 Civ. 9594, 2011 U.S. Dist. LEXIS 9433, 2011 WL 309061, at *3 (S.D.N.Y. Feb. 1, 2011) (citing Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985)). "Where the parties intend to be bound, an oral settlement of a litigation is binding even if a party later changes his or her mind." Id. (citing Powell v. Omnicom, 497 F.3d 124, 129-30 (2d Cir. 2007); [*4] Foster v. City of New York, No. 96 Civ. 9271, 2000 U.S. Dist. LEXIS 1251, 2000 WL 145927, at *4 (S.D.N.Y. Feb. 7, 2000) ("This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart.").

When determining if a settlement agreement is binding, whether it was reduced to writing or made orally, the burden lies with the party seeking enforcement. "'A party seeking to enforce a purported settlement agreement has the burden of . . . demonstrat[ing] that the parties actually entered into such an agreement.'" Min v. Target Stores, 553 F. Supp. 2d 218, 221 (E.D.N.Y. 2008) (alterations in original) (quoting Benicorp Insurance Co. v. National Medical Health Card Systems, Inc., 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006)).

The Second Circuit has set forth several factors to be considered in determining whether parties intended to be bound by an agreement in the absence of a document executed by both sides:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement [*5] at issue is the type of contract that is usually committed to writing.

Winston, 777 F.2d at 80; accord Powell, 497 F.3d at 129; Abel v. Town Sports International Holdings, Inc., No. 09 Civ. 10388, 2010 U.S. Dist. LEXIS 136888, 2010 WL 5347055, at *4 (S.D.N.Y. Dec. 23, 2010).

A. Express Reservation

The first Winston factor focuses on whether either party reserved the right not to be bound prior to a writing.

Although this factor is phrased in terms of 'express' reservations, courts -- including the court in Winston -- also analyze whether the particular facts and circumstances of the case -- such as the nature of the negotiations or the language of any draft agreements -- demonstrate an implied reservation of the right not to be bound until the execution of a written agreement.

Lindner v. American Express Corp., No. 06 Civ. 3834, 2007 U.S. Dist. LEXIS 41178, 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007). Here, there is no indication that either party reserved the right not to be bound in the absence of a writing, either expressly or implicitly. Indeed, they signed a document memorializing the fact that they had come to an agreement (Acknowledgment of Settlement), indicating that they intended to be bound prior to the drafting and executing of a [*6] formal settlement agreement.

B. Partial Performance

With respect to the second factor, neither party has undertaken any performance. The defendant did not pay Ms. Mapel the agreed-upon sum of money (or any amount of money, for that matter), and the plaintiff has

not terminated her action against the defendant. Therefore, this factor does not weigh in the balance. See Cook v. Huckabey, No. 07 CV 4467, 2009 U.S. Dist. LEXIS 91611, 2009 WL 3245278, at *5 (E.D.N.Y. Oct. 1, 2009); Collick v. U.S., 552 F. Supp. 2d 349, 354 (E.D.N.Y. 2008) ("Here, in accordance with the proposed Settlement Documents no payment was made to [the plaintiff] prior to execution, and there is no other evidence of partial performance under the agreement.").

## C. Agreement on All Terms

The parties agreed on all material terms: the settlement amount, including its allocation between lost wages and emotional distress, which affects tax treatment; the time at which the settlement payment would be made; the parties' responsibilities to each other after dismissal of the case and payment of the settlement amount; and a mutual release. (Ladd Decl., ¶¶ 4-5).

## D. Agreement Traditionally Reduced to Writing

The fourth factor is whether the agreement at issue is [*7] of a type that is usually committed to writing. "[S]ettlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Collick, 552 F. Supp. 2d at 354 (quoting Ciaramella v. Reader's Digest Association, Inc., 131 F.3d 320, 326 (2d Cir. 1997)). Under federal common law, however, "parties are free to enter into settlement without memorializing their agreement in a fully executed document, and such agreements are as enforceable as any other oral contract." Figueroa, 2011 U.S. Dist. LEXIS 9433, 2011 WL 309061, at *5 (internal quotation marks and citations omitted); see also Jarowey v. Camelot Entertainment Group, Inc., No. 11 Civ. 2611, 2012 U.S. Dist. LEXIS 187252, 2012 WL 7785096, at *2-3 (S.D.N.Y. Sept. 10, 2012) (positing that New York statute requiring settlement agreements to be in writing does not apply in federal court). Furthermore, the straightforward settlement agreement at issue here, which releases the defendants from liability in exchange for payment of $13,000, is neither complex nor has long-term effects; it is therefore not the type of agreement that would always require a writing. See, e.g., Britto v. Salius, 360 F. App'x

196, 199 (2d Cir. 2010) ("[A]greements of the sort committed [*8] to writing are generally ones that involve complex terms or have long-term effects."); Watson v. City of New York, No. 11 CV 335, 2012 U.S. Dist. LEXIS 172310, 2012 WL 6006066, at *3 (E.D.N.Y. Oct. 24, 2012) (settlement agreement requiring payment of $13,500 in exchange for release of claims not sufficiently complex to require writing). Thus, this factor also weighs in favor of finding the settlement agreement enforceable.

The relevant factors clearly weigh in favor of the enforceability of the parties' oral agreement to settle this case.

## Conclusion

For the reasons set forth above, the defendants' motion to enforce the settlement agreement (Docket no. 31) should be granted. I further recommend that the defendant be directed to place the settlement amount in escrow, to be distributed to the plaintiff within two weeks of the date on which she provides the defendant with a signed release of her claims against the company. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies [*9] delivered to the chambers of the Honorable Ronnie Abrams, Room 2203, 40 Foley Square, New York, New York 10007, and to the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

/s/ James C. Francis IV

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

January 28, 2014